UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Case No.: 14-23906-EEB |
| COUPOUNAS, LLC d/b/a GOLITE, LLC | ) |
| xxx-xx-0555 | ) Chapter 11 |
| Debtor in Possession | ) |
| | ) |

**EMERGENCY MOTION OF DEBTOR TO APPROVE COMPREHENSIVE
SALE PROCESS RELATING TO GOING OUT OF BUSINESS SALE AND SALE TO
THE HIGHEST BIDDER AND TO (A) APPROVE AGENCY AGREEMENT, BID
PROCEDURES AND BID PROTECTIONS, (B) SCHEDULE A SALE HEARING,
(C) APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO,
(D) AUTHORIZE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS; AND (E) GRANT RELATED RELIEF**

## I.    SUMMARY OF RELIEF REQUESTED

1.      By this Motion, the Debtor in Possession requests the entry of two orders.

A.      First, the Debtor requests entry of an order on an expedited basis, substantially in the form attached hereto as **Exhibit A** ("**Bid Procedures Order**"), approving:

i.      a comprehensive sale process relating to a Liquidation Transaction (defined herein) and a Going Concern Transaction (defined herein);

ii.      authorizing the Debtor to enter into the Agency Agreement with Hilco Merchant Resources, LLC ("**Hilco**"), subject to higher or better bids which may be received at the Auction; and

iii.      the Bid Protections to be employed in connection with the proposed Agency Agreement, including:

a.      setting November 10, 2014 at 4:00 p.m. Mountain Time as the deadline for submission of higher and better bids;

b.      authorizing and scheduling an auction to be held on November 12, 2014 at 10:00 a.m. Mountain Time at the offices of Markus Williams Young & Zimmermann LLC, 1700 Lincoln Street, Suite 4550, Denver, CO 80203 in the event that one or more qualified competitive bids are submitted;

{00234478.DOCX; 2}

c.      approving certain bid protections including a $25,000 breakup fee and an expense reimbursement of up to $15,000 to Hilco;

d.      approving bid procedures with respect to an Asset Transaction(defined herein);

e.      scheduling a hearing on approval of the Asset Transaction on November 13, 2014 (the "**Sale Hearing**"), or such other date and time as the Court's calendar may permit, to authorize and approve an Asset Transaction (defined herein); and

f.      approving the form and manner of notice related to the above.

B.      Second, following the Auction (defined herein) and in connection with the Asset Transaction the Debtor requests entry of an order  , pursuant to sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code approving (i) the Asset Transaction with the party submitting the highest or otherwise best bid at the Auction; (ii) authorizing a sale free and clear of all liens, claims and encumbrances; and (iii) granting related relief ("**Approval Order**").

### REASON FOR EMERGENCY HEARING.

The Debtor is a retailer specializing in light weight outdoor gear. Debtor has no funding for new inventory and thus is already in a liquidation mode.  Further, the licensed trade mark "GoLite" is a held by Timberland, which has terminated the license.  Debtor cannot sell product with the GoLite brand after March 31, 2015.  Hilco has informed the Debtor that it must have court approval of the Agency Agreement no later than November 13, 2014 in order to hold sales during the crucial post-Thanksgiving, pre-Christmas period.

### SUMMARY OF TERMS OF AGENCY AGREEMENT

Debtor proposes to enter into an "Agency Agreement" in the form attached hereto as **Exhibit B**.  The reason the agreement is called an Agency Agreement is that the Hilco will act as Debtor's agent in conducting "going out of business", "store closing", "sale on everything", "everything must go "and similar themed sales (the "**Sale**") on behalf of the Debtor at the Debtor's store locations.  Hilco will pay to Debtor a guaranteed payment of 65% of the aggregate cost value of the merchandise being sold.  The current expectation is that this will result in a guaranteed payment to Debtor in an amount between $780,000 and $877,500 .  In addition, Hilco will fund expenses of the Sale, including, but not limited to, rent, payroll, utilities, and advertising.  In the event that proceeds from the sale exceed the  guaranteed payment plus expenses and a 6% sales commission to Hilco, Debtor will receive 80% of any additional excess proceeds.  In addition, Hilco  will liquidate the Debtor's fixtures, furniture and equipment for a 20% commission.  The Agency Agreement is subject to higher and better bids.

In further support of this Motion, the Debtor respectfully represents as follows:

## II.  JURISDICTION AND VENUE

2.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 363 and 365. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.  GENERAL BACKGROUND

3.     On October 13, 2014 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtor is operating its businesses and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No request for the appointment of a trustee or examiner has been made in this chapter 11 cases, and no committees have been appointed or designated.

6.     The Debtor operates retail stores offering merchandise consisting of a wide range of technical and casual outerwear. Debtor's products are a range of lightweight and sustainable apparel and equipment designed specifically for outdoor athletes.

7.     The Debtor currently operates six stores in Colorado. The Debtor leases all of the store locations. The Debtor also sells merchandise through ecommerce at its distribution center located in Boulder, Colorado.

8.     The Debtor has a single secured lender, GemCap Lending I, LLC, ("**GemCap**"). On the Petition Date, GemCap is owed approximately $816,475 exclusive of fees and expenses.

**A.     EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE AND THE DEBTOR'S DECISION TO CONDUCT THE SALE**

9.     In early 2014, the Debtor's management and advisors performed an analysis of the Debtor's operations and financial performance to identify potential capital sources or a sale of the company.  Specifically:

> On February 8, 2014 – the Debtor and its Financial Advisor had their initial meetings.
>
> On March 19, 2014, the Debtor sent an investment summary to 60 potential capital sources all of whom are characterized as institutional investors.
>
> As of March 31, 2014, the Debtor received one affirmative decline and twenty requests for a non-disclosure agreement.  Debtor receive nine executed non-disclosure agreements and delivered a Confidential Investment Memorandum to those nine requestors.  Two out of the nine

declined to engage in any further review. Seven parties engaged in diligence and entered the data room.

The initial timeline called for bids to be received by April 30, 2014, however the Debtor received no bids.

From April 1, 2014 through August 31, 2014, Debtor identified forty additional sources (bringing total to 100) and delivered investment summaries to such sources. The Debtor continued to focus on financial partners, but also contacted some potential strategic partners (existing retail apparel companies).  In this phase, ten non-disclosure agreements were executed and Confidential Investment Memoranda were delivered to those ten parties. None of the ten pursued further due diligence.

The Debtor had direct discussions with one party, which continued through July 28, 2014, when discussions were terminated by the investor.

Since September 1, 2014, Debtor's efforts have focused on "friends and family" and multiple parties contacted by the Debtor's principal. One of those parties remains actively engaged.

10.     Debtor realized that pursuit of a new capital infusion needed to be coupled with a potential sale of the company as a going concern or a liquidation sale of Debtor's asset.

11.     Debtor filed its Chapter 11 petition to complete this process.[1]

12.     In connection therewith, and in consultation with GemCap, the Debtor and its advisors began discussions with three different national liquidation specialists.

13.     The Debtor received bids from two of the liquidation specialists.

14.     The Debtor, in consultation with its advisors and GemCap, determined that to achieve a value maximizing bid from the liquidation specialists, it was in the best interest of all parties to select Hilco Merchant Resources, LLC as the liquidation agent for conducting the Sale, which process involved negotiation of an Agency Agreement.

15.     As indicated above, the Debtor, through its advisors, also contacted several other financing and potential going concern buyers, who expressed an interest in a going concern transaction for the Debtor's assets (a "**Going Concern Transaction**") but none of these parties could commit to a financing or Going Concern Transaction prior to the Petition Date. Accordingly, the Debtor intends to continue to solicit interest from these parties to achieve competing going concern bids as more fully discussed below.

---

[1] Debtor also needed the protection of the automatic stay because its bank accounts were about to be garnished by a judgment creditor.

16.     Owing to these efforts, the Debtor contemplates a marketing process on a dual track:

(i)     the Debtor will market the liquidation of all of the Debtor's assets (a "**Liquidation Transaction**") and seek higher and otherwise better liquidation bids than the Hilco stalking horse Agency Agreement bid, and, at the same time,

(ii)    the Debtor will  market a Going Concern Transaction pursuant to section 363 of the Bankruptcy Code with financial and strategic buyers. In the event that a potential purchaser seeks to purchase some or all of the Debtor's operations as part of a Going Concern Transaction, the Debtor has preserved the option of pursuing such a Going Concern Transaction.

## C.     ENTRY INTO THE AGENCY AGREEMENT

17.     As discussed above, the Debtor and its advisors engaged in discussions with two national liquidation firms that specialize in, among other things, large scale liquidation of merchandise, inventory, and other goods of similar type and scale to serve as a potential agent for the Debtor in conducting the Sale of all of the Debtor's the merchandise and inventory (the "**Merchandise**"), the Debtor's owned furniture, fixtures, and equipment therein (the "**Owned FF&E**", all other assets of the Debtor ("**Other Assets**") and, collectively together with the Merchandise and the Owned FF&E, the "**Subject Assets**") at the Debtor's remaining six stores and central distribution facility, and otherwise assisting the Debtor with the Liquidation Transaction.

18.      The Debtor determined that the proposal submitted by Hilco, subject to higher and better offers,  presented the best opportunity to maximize value for the estate through the Sale, while preserving the Debtor's option to pursue a higher and better Going Concern Transaction.

19.     The Debtor engaged in negotiations with Hilco and, ultimately, the parties were able to reach an agreement regarding the terms of the Agency Agreement, pursuant to which Hilco will conduct the Sale and liquidate the Subject Assets. The Agency Agreement was negotiated in good faith and at arm's length, and the Debtor believes the terms thereof are fair and reasonable.

20.     To seek to maximize the value of the Debtor's assets, by this Motion, the Debtor requests authority to conduct an auction (the "**Auction**") for a Liquidation Transaction and a Going Concern Transaction (as the case may be, an "**Asset Transaction**").  .

21.     The Debtor believes that conducting the proposed Liquidation Transaction will provide maximum value to the Debtor's estate in the event that a Going Concern Transaction cannot be consummated.  Specifically, Hilco will establish a minimum bid for the Auction and a complete set of offer terms with respect to the Subject Assets, against which competing bids and terms may be measured.

22.     In the event that the Debtor does not receive a higher and/or better bid for a Going Concern Transaction at the Auction, the Debtor proposes to commence the Sale immediately following entry of an order approving the Liquidation Transaction to the highest and best bidder, and thereby stem any further losses resulting from the continued operation of the Debtor's business. The Debtor believes that any delay in commencing the Sale will diminish value for several important reasons. First, delays in the liquidation process could cause the Debtor's inventory become out of season, thus reducing the value of the Merchandise. Second, commencing the Sale expeditiously to coincide with the upcoming holiday season will result in maximum value for the Subject Assets.

## E.  THE SALE PROCESS

23.     The Debtor proposes to solicit bids for liquidation of the Subject Assets and to conduct an Auction for the Subject Assets under the following time line:

(A) the deadline to submit competing bids will be on or before 4:00 p.m. Prevailing Mountain Time on **November 10, 2014**;

(B) if one or more competing bids are received on or before 4:00 p.m. Mountain time on **November 10, 2014**, the Debtor will conduct an Auction, beginning at 10:00 a.m. Prevailing Mountain Time on **November 12, 2014**, and more fully described herein, at the offices of Markus Williams Young & Zimmermann LLC, 1700 Lincoln, Suite 4550, Denver, Colorado 80203 or an alternative location to be mutually agreed upon by the Debtor and GemCap, and, if appointed, the Official Committee of Unsecured Creditors (the "**Committee**").

24.     The shortness of time is driven by the calendar and by market forces. It is axiomatic that retail is a very seasonal business. The holiday shopping season begins in less than six weeks and any buyer – strategic, financial or asset disposition – will want the transaction closed and funded before the holiday season begins in earnest. Accordingly, the Debtor's value will be higher if a buyer (or buyers) can avail themselves of the holiday season and values will, in all likelihood, drop substantially after the holiday season.

### i.        Liquidation Transaction Process

25.     The terms of the Agency Agreement shall serve as minimum opening bid for any persons proposing to make bids for a Liquidation Transaction. Any person desiring to make a bid to act as the Debtor's agent in connection with a Liquidation Transaction shall submit such bid by **November 10, 2014 at 4:00 p.m.** (Prevailing Mountain Time) (the "**Bid Deadline**").  Any bidder (or bidders) that is (or are) making a bid to liquidate substantially all of the Debtor's property, such first single bid or combination of bids must, individually or in the aggregate, provide for a minimum overbid of 69.00%  of the Cost Value of the Merchandise (as defined in the Agency Agreement), with subsequent overbids in increments of not less than .1%.

ii.        **Going Concern Transaction Process**

26.    Any bids relating to a Going Concern Transaction will be due on the Bid Deadline and any bidder making a Going Concern Transaction Bid shall provide a deposit an amount not less than ten percent (10%) of the value of such bidder's bid (which requirement may not be waived by the Debtor)**.** If one or more Going Concern Transaction proposals are received, the Debtor in conjunction with GemCap and the Committee, will evaluate which, if any, of such bids should be deemed qualified bids for purposes of participating in the Auction as described below. The Debtor, in consultation with GemCap and the Committee, will also determine which of such bids is the highest and best bid for purposes of determining the opening Going Concern Transaction bid at the Auction.

iii.       **The Auction**

27.    The Auction described herein will be held beginning at 10:00 a.m. Prevailing Mountain Time on **November 12, 2014**, at the offices of Markus Williams Young & Zimmermann LLC, 1700 Lincoln, Suite 4550, Denver, Colorado 80203.

28.    At the conclusion of the Auction and after a sufficient opportunity for the Debtor and its advisors to review the results of the Auction in consultation with GemCap and the Committee, the Debtor shall inform the relevant parties of the decision regarding the party that submitted the highest and otherwise best bid (the "**Successful Bidder**").

iv.       **Break-Up Fee and Expense Reimbursement**

29.    The Agency Agreement provides the following break-up fee and expense reimbursement structure: the Stalking Horse Liquidator will receive (i) a break-up fee of $25,000 (the "**Break-Up Fee**") plus (ii) its reasonable and documented actual out of pocket costs not to exceed $15,000. (the "**Expense Reimbursement**" and together with the Break-Up Fee, the "**Bid Protections**"), if, among other things (a) Hilco is not approved as the Successful Bidder by the Court after completion of the Auction. The Break Up Fee represents approximately between 2.47% and 3% of the guaranteed amount to be paid by Hilco and is well within the customary range of approximately 3%. The Bid Protections are designed to foster bidding while at the same time compensating Hilco  for, among other things, (y) the risk it took in entering into the Agency Agreement subject to higher and better offers without any assurances that its Liquidation Transaction will ultimately be consummated and (z) exposing its bid to the market. The Bid Protections will enable the Debtor to procure a far more favorable agreement than it would have absent the Bid Protections.

30.    In an exercise of the Debtor's sound business judgment, the Debtor determined that it is in the best interest of the Debtor's estate, its creditors and all parties in interest for the Debtor to conduct an Auction for the sale of the Subject Assets pursuant to procedures outlined herein.

## IV.  DEBTOR'S BUSINESS JUDGMENT AND EXISTING AUTHORITY SUPPORT APPROVAL OF THE AGENCY AGREEMENT AND THE SALE.

31.     In the event that no higher and/ or better Going Concern Transaction is received at the Auction, the Debtor requests that the Court authorize the Debtor to (a) conduct the Sale of all of the Subject Assets pursuant to an Agency Agreement with the liquidator who submitted the highest and best bid at the conclusion of the Auction. It is contemplated that the Sale will be conducted according to the schedule (the "**Sale Term**"): the Sale shall commence on the first calendar day after the entry of the Approval Order, but not later than November 14, 2014, and the Successful Bidder with respect to a Liquidation Transaction (the "**Liquidation Agent**") shall complete the sales on or before December 31, 2014. The Liquidation Agent shall conduct the Sale in accordance with the Sale Guidelines (the "**Guidelines**") annexed to the Agency Agreement as Exhibit 8.1 and incorporated herein.

32.     The Sale of the Subject Assets represents substantial value to the Debtor's estate. The Debtor believes that, absent an higher and/or better Going Concern Transaction, the disposition of the Subject Assets through the  Sale as set forth in the Agency Agreement, will maximize the value of the Debtor's estate.

33.     The Debtor's decision to liquidate the Subject Assets in the absence of a higher and/or better Going Concern Transaction is an exercise of sound business judgment. The Debtor believes that any attempt to restore the profitability of the enterprise in the absence of a substantial capital infusion and/or an alternative, more favorable financing arrangement, would be unrealistic.

34.     As a necessary part of this process, the Debtor requests the further authorization to conduct the Sale notwithstanding any contrary state or local statutes, rules or ordinances purporting to govern or restrict the conduct of "store closing", "going-out-of- business", "sale on everything", "everything must go" or similarly themed sales. In addition, the Debtor also request authorization to conduct the sales notwithstanding any provisions in the retail leases purporting to restrict the Debtor's ability to conduct the  Sale.

35.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtor. *See In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring Debtor to maximize estate assets").

36.     The Debtor respectfully requests approval of the Agency Agreement with Hilco subject to higher and better offers. Although the Debtor respectfully refers the parties to the Agency Agreement in its entirety, certain of the material terms are set forth below:[2]

---

[2] Capitalized terms used in this summary shall have the meanings ascribed to them in the Agency Agreement. This summary of the Agency Agreement is for summary purposes only and is qualified in its entirety by the terms and provision of the Agency Agreement.

A.     Expenses of the Sale: During the Sale Term, the Agent shall be unconditionally responsible for all Expenses listed in section 4.1 of the Agency Agreement arising during the Sale Term, including (subject to certain limitations set forth in the Agency Agreement) actual Occupancy Expenses (up to per diem, per location category amounts), Store-level Retained Employee wages and commissions, payroll taxes and benefits (subject to an agreed upon cap on such payroll taxes and benefits).

B.     Guaranteed Amount: As a guaranty of the Agent's performance, in addition to the payment of Expenses, the Agent guarantees that the Debtor shall receive an amount (the "Guaranteed Amount") equal to Sixty five percent (65%) (the "Guaranteed Amount") of the aggregate Cost Value of the Merchandise, subject to certain adjustments.

C.     Owned FF&E: Any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking owned by the Debtor and located at the Stores, the Distribution Center and/or the Debtor's corporate offices shall be sold by the Agent for a twenty percent (20)% commission.

D.     Payment Date: On the second business day after entry of the Approval Order, the Agent shall pay to the GemCap as the Debtor's designee, an amount (the "**Initial Guaranty Payment**") equal to **eighty**  percent (80%) of estimated Guaranteed Amount. The balance of the Guaranteed Amount shall be paid by wire transfer to GemCap on the earlier of (x) the second business day following the issuance of the Final Inventory Report, and (y) thirty days after the Sale Commencement Date.

37.    The Debtor believes that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their business judgment. Accordingly, the Debtor respectfully request that this Court authorize the Debtor to enter into the Agency Agreement, subject to higher and better bids.

**A.     THE BID PROTECTIONS ARE A REASONABLE PERCENTAGE OF THE   PURCHASE PRICES AND SHOULD BE APPROVED**

38.    As a condition to the Agency Agreement, the Debtor is required to obtain approval of the Bid Protections in the Bid Procedures Order. The Bid Protections represents a fair compensation and reimbursement of the expenses incurred in conducting due diligence and negotiating the Agency Agreement. Absent such provisions, Hilco would likely not have agreed to act as a "stalking horse" in connection with a transaction for which they may not ultimately be the Successful Bidder. As has been repeatedly demonstrated in recent years, obtaining a "stalking horse" is critical to successful and efficient conduct of a sale process. The presence of such a "stalking horse" sets a floor for the auction and encourages bidding, thereby maximizing a seller's return. In order to provide this benefit, though, the "stalking horse" must be compensated for, inter alia, the risk it takes by entering into an agreement subject to higher and better offers without any assurances that its transaction will ultimately be consummated, (y) exposing its bid

to the market, and (z) standing by its bid commitment while the seller's marketing process plays out.  The Debtor thus believes that in this instance it was necessary and appropriate for the Debtor to agree to the Break Up Fee, which amounts to approximately 2.8% to 3% of the Guaranteed Amount being paid by Hilco under the Agency Agreement.

39.     Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under § 363 of the Bankruptcy Code. *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that breakup fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (break-up fees in merger agreement approved); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 break-up fee to outbid contract vendee following sale of debtor's property was not unreasonable absent evidence that fee chilled bidding).

40.     In considering whether to approve a break-up fee, courts generally consider the following three factors: (1) the relationship between the initial bidder and the seller; (2) whether the fee is designed to encourage bidding; and (3) the size of the fee in relation to the purchase price. *See In re Integrated Resources*, 147 B.R. at 657-63.

41.     Obtaining approval and authority to pay the Bid Protections will facilitate the Debtor's efforts to assure a sale to a contractually committed bidder at a price(s) the Debtor believes is fair, while at the same time providing the Debtor with the potential of even greater benefit to the estate.

42.     A break-up fee which constitutes a fair and reasonable percentage of the proposed purchase price and which is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible. *See, e.g., In re 995 Fifth Ave. Assoc.*, 96 B.R. 25, 28 (Bankr. S.D.NY. 1989).  Accord In re Integrated Resources, Inc., 147 B.R. at 662 (break-up fee reasonable percentage of  proposed purchase price and in accord with industry averages).

43.     As set forth above, the Break-Up Fee represents approximately 2.8% to 3% of the Guaranteed Amount to be paid under the Agency Agreement.  This percentage is well within the order of magnitude as break-up fees approved in other cases. *See, e.g., Consumer News & Business Channel Partnership v. Financial News Network, Inc. (In re Financial News Network, Inc.)*, 980 F.2d 165, 167 (2d Cir.1992) (noting without discussion $8.2 million breakup fee on $149.3 million transaction (5.5% of consideration offered)); *Cottle v. Stores Communications*, 849 F.2d 570, 578-79 (11th Cir 1988) (approving a combined $29 million fee on $2.5 billion transaction, 1.16%); *see also LTV Aerospace & Defense Co. v. Thomson-CSF, S.A. (In re Chateugay Corp.)*, 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing $20 million "reverse breakup fee" payable to debtor on $450 million offer (4.4% of consideration)).

44.     The Bid Protections are beneficial to the Debtor's estate and its creditors, as the Agency Agreement establishes a floor for further bidding on the Subject Assets, and served as a basis for procuring GemCap's's support as the Debtor continues its efforts to procure a Going Concern Transaction.

45.     Hilco is unwilling to commit to holding open its offer to liquidate the inventory (which is the vast majority of the value of the Subject Assets) unless the Bid Procedures Order authorizes payment of the Bid Protections. Thus, absent entry of the Bid Procedures Order and approval of the Bid Protections, the Debtor may lose the opportunity to obtain the highest and best offer it has received to date.

46.     The Debtor hereby requests that the Court approve the following bidding procedures (including the payment of the Bid Protections as summarized above):

A.     The Debtor will cooperate and provide access to potential bidders who seek to conduct diligence (collectively, the "**Potential Bidders**").

B.     Within one (1) business days following the entry of the Bid Procedures Order, the Debtor will serve the Notice (as defined below) on: (a) the Office of the United States Trustee for the District of Colorado, (b) the Debtor's twenty largest unsecured creditors, (c) counsel to GemCap, (c) all parties known to be asserting a lien in the Debtor's assets , (d) each of the Debtor's landlords, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the Office of the Attorney General of the State of Colorado, (h) the city of Boulder, Colorado, (i) Boulder County, Colorado, (j) City and County of Denver, Colorado, (k) the city of Ft. Collins, Colorado, (l) Weld County, Colorado (m)  the city of Lakewood Colorado, (n) Jefferson County, Colorado, (o) Durango, Colorado, (p) La Plata County, Colorado (q) Town of Silverthorne, Colorado, (r) Summit County, Colorado and (s) all entities entitled to notice pursuant to Bankruptcy Rule 2002 .

C.     On or before 4:00 p.m. Prevailing Mountain Time on **November 10, 2014** (the "**Bid Deadline**"), each Potential Bidder must submit a Qualified Bid (as defined below) to the following:   (i) counsel to the Debtor, Markus Williams Young & Zimmermann LLC 1700 Lincoln, Suite 4550, Denver, Colorado 80203, Attn: James T. Markus, Esq. and Donald D. Allen, Esq., (ii) counsel to GemCap, Cohen Tauber Spievack & Wagner P.C., 420 Lexington Avenue, Suite 2400, New York, NY 10170, Attn:  Robert A. Boghosian, and (iii) counsel to the Committee (collectively, the "Bid Recipients").

D.     Neither of the Bid Recipients shall be permitted to share the bids received among the bidders. All Bids are irrevocable until seven days after the Sale Hearing.

E.     All Liquidation Transaction bids shall be based upon the terms and conditions of the Agency Agreement submitted by Hilco and shall provide for a Guaranty Percentage (as defined in the Agency Agreement) of at least sixty-nine percent (69%) with no other modifications to the Agency Agreement submitted by Hilco [3] . Going Concern Transaction bids are not subject to an initial overbid requirement and will be

---

[3]  If potential liquidation bidders propose other modifications to the Hilco  Agency Agreement, any such modifications will be considered by the Debtor in determining whether to accept or reject such Bid.

based on a proposed asset purchase agreement (the "Form APA") to be provided by the Debtor to prospective Going Concern Transaction bidders.

 F. Bids for a Liquidation Transaction or a Going Concern Transaction that meet the following conditions shall be deemed "Qualified Bids," and bidders submitting Qualified Bids shall be deemed "Qualified Bidders":

 (i) To be considered by the Debtor as a Qualified Bid, such bid must (unless otherwise determined by the Debtor, in consultation with GemCap and the Committee): (a) give sufficient indicia that the bidder or its representative is legally empowered, by power of attorney or otherwise, to both bid on behalf of the bidder and also to complete and sign, on behalf of the bidder, a binding and enforceable agency agreement or an asset purchase agreement, as applicable; (b) shall provide for the bidders purchase of Hilco's signage for the Sale and reimburse Hilco for out of pocket shipping costs associate with the signage; (c) in the case of a Liquidation Transaction, deliver to the Bid Recipients on or before the Bid Deadline, (A) written evidence of the bidder's ability to consummate the transaction as required by the Debtor, (B) a redline version of the submitted Agency Agreement compared to the Agency Agreement submitted by Hilco (C) a clean version of the submitted Agency Agreement executed by such liquidation bidder which does not contain any contingencies including, but not limited to due diligence and financing contingencies, and (d) in the case of a Going Concern Transaction, deliver to the Bid Recipients on or before the Bid Deadline (I) written evidence of the bidder's ability to consummate the transaction as required by the Debtor, (II) a redline version of an Asset Purchase Agreement compared to the Form APA, (III) a clean version of the submitted Asset Purchase Agreement executed by such Going Concern Transaction bidder which does not contain any contingencies including, but not limited to due diligence and financing contingencies. Any bidder making a Going Concern Transaction Bid shall provide a deposit an amount not less than ten percent (10%) of the purchase price of such bidder's bid (which requirement may not be waived by the Debtor). If one or more Going Concern Transaction proposals are received, the Debtor in consultation with GemCap and the Committee, will evaluate which, if any, of such bids should be deemed qualified bids for purposes of participating in the Auction as described below.

 (ii) Potential Bidders shall be required to complete and execute a confidentiality agreement. Upon execution of a confidentiality agreement, Debtor will provide reasonable access to due diligence material before the Auction.

 (iii) The Debtor, in consultation with GemCap and the Committee will determine (i) whether a bid(s) is a Qualified Bid(s), and (ii) at the conclusion of the Auction, which bid constitutes the highest and/or best bid.

 (iv) The Bid Recipients and each bidder and all other entities shall keep Qualified Bids confidential,.  Debtor, in consultation with GemCap and the Committee may request additional information from a bidder to evaluate the bidder's ability to

consummate a transaction and to fulfill its obligations in connection therewith, and such bidder shall be obligated to provide such information.

(v) Each bidder, as a consequence of submitting a bid, shall be deemed to acknowledge: (a) that it is bound by these bidding procedures; (b) that it had an opportunity to inspect and examine the Debtor's assets and to review all pertinent documents and information with respect to the Debtor's Assets before making its offer and that each such bidder relied solely on that review and upon its own investigation and inspection in making its bid; and (c) except as expressly provided for in the agency agreement accompanying its bid, such bidder is not relying upon any written or oral statements, representations or warranties of the Debtor, their agents or representatives.

(vi) At the commencement of the Auction, the Debtor will announce the best bid (or combination of bids) received to date and will open the Auction for other Qualified Bidders to improve upon their bid. Bidding increments will be announced at the outset of the Auction.

G.     The Auction will be conducted on **November 12, 2014 at 10:00 a.m.** (Prevailing Mountain Time) at the offices of Markus Williams Young & Zimmermann LLC, 1700 Lincoln, Suite 4550, Denver, Colorado 80203 or such other location as may be selected by the Debtor. Only Qualified Bidders who have complied with the Bid Procedures may improve their Bids at the Auction.  Bidding at the Auction will continue until such time as the highest or otherwise best Bid is determined by Debtor in consultation with GemCap and the Committee. The Debtor in consultation with GemCap and the Committee may adopt or modify rules for the bidding process. The Debtor, in consultation with GemCap and the Committee, will select the highest or otherwise best Bid(s) at the conclusion of the Auction, subject to Court approval, and the winning bidder(s) will be required to enter into a definitive agency agreement and/or asset purchase agreement (as consensually modified by the parties, if appropriate), as applicable, before the Auction is deemed closed.

H.      The Debtor with the consent of GemCap reserves the right to, to (i) adjourn the Auction or (ii) modify the Bidding Procedures at the Procedures Hearing or at the Auction.

I.      The Debtor, in consultation with GemCap and the Committee, will also determine which of such bids is the highest and best bid for purposes of determining the opening going concern bid at the Auction.

J.      ANY BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED A QUALIFIED BIDDER.

**B.  SCHEDULING OF A HEARING ON THE MERITS AND APPROVING NOTICE IN CONNECTION THEREWITH ON AN EXPEDITED BASIS ARE NECESSARY TO CONDUCT A SALE TAKING ADVANTAGE OF END OF YEAR RETAIL PURCHASING.**

**i.   The Debtor Requests that the Court Set the Sale Hearing on November 13, 2014**

47.    The Debtor seeks two hearings in connection with the Sale Motion: a hearing to consider the signing of the Bid Procedures Order and a Sale Hearing. The Bid Procedures Order, if entered, will approve and establish the procedures to be employed for the proposed sale of the Subject Assets, including, among other things, (a) the Bid Protections, and (b) the form and manner of notice of the proposed Auction. The Bid Procedures Order will also schedule the Sale Hearing to consider entry of the Approval Order.

48.    Pursuant to Bankruptcy Rules 2002(m) and 9007, this Court is empowered to enter any order designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent, except as otherwise provided by these rules.

49.    Furthermore, to allow the Debtor sufficient opportunity to analyze and respond to objections, if any, to the entry of the Approval Order, the Debtor request that the deadline for filing such objections be set to a date at least three days prior to the Sale Hearing which would be November 10, 2014 (the "**Objection Deadline**") notwithstanding any rule or previous order of the Court governing general response deadlines in this case; provided, however, objections to the selection of the Successful Bidder after the Auction may be raised at the Sale Hearing. The proposed Objection Deadline is adequate because notice of the Motion and Sale Hearing will be provided to the notice parties more than fourteen (14) days before the Sale Hearing.

50.    For the reasons set forth more fully herein, the Debtor believes that, as more fully described above, the upcoming holiday shopping season, including the critical "Black Friday" post-Thanksgiving shopping weekend, provides a unique window of opportunity for the Debtor to maximize values from the liquidation of its assets when retail customers are most likely to shop. Accordingly, the Debtor respectfully request that the Sale Hearing on this matter be scheduled for hearing on the merits on November 13, 2014.

**ii. Reasonable Notice of the Asset Transaction is Being Provided**

51.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction. See Fed. R. Bankr. P. 6004(f)(l). Further, pursuant to Bankruptcy Rule 2002(a)(2), this Court may, for cause shown, shorten or direct another method of giving notice regarding the general twenty (20) day by mail period for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. See Fed. R. Bankr. P. 2002(a)(2). Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale,

and the time fixed for filing objections. See Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. *Id*.

52.     Within one (1) business day after entry of the Bid Procedures Order, the Debtor intends to serve the Bid Procedures Order upon all interested parties, including those potential bidders who may bid at the Auction.

53.     Such notices and procedures set forth herein and in the Bid Procedures Order satisfy the notice requirements of Bankruptcy Rules 2002 and 6004 and section 363(b) of the Bankruptcy Code, and constitute good and sufficient notice and that no other or further notice is required. Accordingly, the Debtor respectfully submits that this Court should authorize such notices.

**C.     THE PROPOSED SALE OF SUBJECT ASSETS SHOULD BE GRANTED FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES**

**i.     The Proposed Sale and Process Is Within the Debtor's Sound Business Judgment.**

54.     The relief requested by this Motion is appropriate under the Court's equitable powers under section 105(a) of the Bankruptcy Code and authority to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code.

55.     Section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." See 11 U.S.C. § 105(a). Section 105 confers broad powers on bankruptcy courts: [Section] 105 [is] 'an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction. . . ." 2 L. King, Collier on Bankruptcy § 105.01 at a105-3 (1996). The Debtor recognizes that section 105(a) of the Bankruptcy Code may be used only to carry out the provisions of Title 11." The major premise of chapter 11, however, is the continued and uninterrupted operation of the debtor in possession to the greatest extent possible. Thus, the Debtor's requested relief is consistent with the "furtherance of the provisions of the Bankruptcy Code." Id.; see also In re Southmark Corp., 113 B.R. 280, 281 (Bankr. N.D. Tex. 1990) (stating that "the court may use [section] 105(a) to fashion orders that are necessary or appropriate to further a substantive provision of the Code").

56.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." A debtor must demonstrate sound business judgment for a sale of assets outside of the ordinary course of business. See, e.g., Institutional Creditors of Continental Airlines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986).

57.     Courts look to various factors to determine whether to approve a motion under section 363(b) of the Bankruptcy Code, such as: (a) whether a sound business reason exists for the proposed transaction; (b) whether the purchase price is fair and reasonable; (c) whether the transaction has been proposed in good faith; and (d) whether adequate and reasonable notice is provided. *See, e.g., In re Condere*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998).

### ii.     Sound Business Reasons Exist for the Asset Transaction.

58.     Adequate business reasons exist to justify an Asset Transaction. As discussed above, the Debtor has determined that the comprehensive sale process will maximize the return to its creditors. Furthermore, the administrative and economic costs of maintaining such assets for an uncertain period of time would not be in the best interest of the estate. The Asset Transaction (in whatever form that ultimately results) represents the highest and best use for the Debtor's assets.

59.     Under these circumstances, sound business reasons exist that justify the sale of the Subject Assets outside of the ordinary course of business.

### iii.     The Proposed Consideration Offered is Fair and Reasonable.

60.     To dispel any doubt, the Debtor is subjecting its assets to competing bids from buyers interested in all or part of its stores, inventory and other assets at the Auction, thereby ensuring that the Debtor will receive the highest and/or otherwise best value for their assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated by a "market check" through an auction process, which is the best means for establishing whether a fair and reasonable price is being paid for the Subject Assets.

### iv. The Sale Process Has Been Undertaken in Good Faith.

61.     Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m) (emphasis added).

62.     While the Bankruptcy Code does not define "good faith," the court in In re Sullivan Central Plaza I, Ltd., 106 B.R. 934 (Bankr. N.D. Tex. 1998) stated that: [t]he type of conduct of a Buyer which would destroy its good faith status under § 363(m) involves fraud, collusion between the Buyer and other bidders of the trustee, or an attempt to take grossly unfair advantages of other bidders. 106 B.R. at 938 (citing Matter of Bleaufontaine, Inc., 634 F.2d 1383, 1388 (5th Cir. 1981)).

63.     The Debtor hopes that the ultimate Asset Transaction will be the product of extensive bidding processes among the bidders. Accordingly, the Debtor requests the Court to

find that the Successful Bidder is a "good faith" Buyer under section 363(m) of the Bankruptcy Code.

### D. Compliance With Any State and Local Laws, Statutes, Rules and Ordinances on Liquidation Sale Should Be Waived.

64.     Certain municipalities or counties in which the Debtor's retail locations are located may have licensing and similar requirements with respect to the conduct of liquidation and store closing sales. In certain circumstances, however, these requirements do not apply where such sales are conducted pursuant to an order of, and under the supervision of a court. Accordingly, the Debtor requests that this Court authorize the Debtor and the Liquidation Agent conduct the Sale without the necessity of, and the delay associated with, obtaining various state licenses and/or satisfying any additional requirements in connection therewith.

65.     As a general matter, under 28 U.S.C. § 959(b), a debtor-in-possession must "manage and operate the property. . . according to the requirements of the valid laws of the state in which such property is situated. . . ." Courts, however, have held that a debtor-in-possession that is liquidating estate assets does not "manage and operate" the property for the purposes of section 959(b). *See Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.)*, 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that section 959(b) does not apply when debtor-in-possession is liquidating property and not operating business); *Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 778 n. 18 (8th Cir. 1981) (no need for a state license solely for a liquidation), cert. denied, 454 U.S. 1162 (1982);  Because the Debtor may seek to liquidate the Subject Assets completely, section 959(b) does not require compliance with these state and local licensing procedures and other regulations, especially when the Debtor would conduct the Sale with the knowledge and oversight of its creditors and this Court.

66.     Moreover, federal bankruptcy law preempts state and local laws that conflict with the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("[T]rustees and debtor-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997). While preemption of state law is not always appropriate, see *Baker & Drake, Inc. v. Public Serv. Comm'n of Ne. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate when, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety. *See id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.*, 91 B.R. at 196-97 (holding that automatic stay under section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

67.     Here, any local licensing requirements, time limits or bulk sale restrictions on liquidation sales would undermine the fundamental purpose of section 363(b) by placing

constraints on the Debtor's ability to marshal and maximize estate assets for the benefit of creditors.

68.     Accordingly, the Debtor respectfully requests that the Court authorize it to conduct the Sale and related transactions without the necessity of, and the delay associated with, obtaining various local licenses, observing local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, transferring of merchandise, and the like. Finally, the Debtor requests that the Court enjoin any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with, or otherwise hinder consummation of the store closing sales or advertisement of such sales. *See Missouri v. United States Bankruptcy Court*, 647 F.2d at 776 (holding that attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of Debtor's estate and therefore violated automatic stay), the requested waiver is narrowly tailored to facilitate the successful consummation of the Sale. The Debtor does not seek a general waiver of all state and local requirements, and the Debtor and the Liquidation Agent fully intend to be bound by and comply with state and local health and safety laws.

69.     Similar relief has been granted in other bankruptcy cases. See In re FFW OPCO, Ltd., No. 10-33761 (HDH) (Bankr. N.D. Tex. June 9, 2010) ("The Sale shall be conducted by FFW and PFP without the necessity of compliance with any federal, state or local statute or ordinance (other than Safety Laws), lease provision, or licensing requirement affecting store closing, going out of business, bankruptcy liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage").

### E.     Abandonment of Certain Property in Connection with the Sale

70.     During the course of the Sale, the Debtor may determine that the costs associated with holding and/or selling certain property (including, but not limited to, Owned FF&E) exceeds the likely proceeds that may be realized upon its sale. As such, the property is of inconsequential value and benefit to the Debtor's estate and may, in certain cases, be burdensome to the Debtor's estate. To maximize the value of the Debtor's estate to be realized in connection with the  Sale, the Debtor requests authority under § 554(a) of the Bankruptcy Code to abandon property the Debtor determine to be burdensome, or of inconsequential value and benefit, to the Debtor's estate.

### F.     Any Terms in the Leases Restricting Liquidation Sales Should be Held to be Unenforceable.

71.     Certain of the leases and other agreements governing the premises or conduct of business at the Closing Locations (the "Leases") may contain provisions purporting to restrict or prohibit the Debtor from conducting store closing, liquidation, or similar sales (the "**Contractual Restrictions**"). Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See, e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that enforcement of such lease restrictions would

"contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct going-out-of-business sale).

72.     As such, to the extent that such provisions or other contractual restrictions exist in any of the Leases pertaining locations where Debtor would conduct the  Sale, the Debtor respectfully requests that the Court invalidate such provisions and authorize the Debtor and the Liquidation Agent to conduct the  Sale without interference by any landlords or other persons affected, directly or indirectly, by the  Sale.

73.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by § 363(b)). To obtain court approval to use property under § 363(b) of the Bankruptcy Code for the purpose of a store closing sale, the Debtor need only show a legitimate business justification for the proposed action. *See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (7th Cir. 1983); *In re Delaware and Hudson Rv. Co.*, 124 B.R. 169 (D. Del. 1991) (noting that Third Circuit has adopted "sound business judgment" test for section 363(b) asset sales).

### G.  Good Faith under Section 363(m).

74.     Section 363(m) of the Bankruptcy Code provides: The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith", the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that: [t]he requirement that a purchaser act in good faith . .. speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. 788 F.2d at 147 (citations omitted).

75.     The Debtor submits, and will adduce evidence (either through direct testimony or by proffer) at the Sale Hearing, that sale of the transactions contemplated hereby will be conducted in an arm's-length transaction, in which the Debtor and the Successful Bidder will have at all times acted in good faith under applicable legal standards. The Debtor shall therefore

request that the Court make a finding that the Successful Bidder at the Auction has/have entered into an asset purchase agreement and/or an alternative agency agreement, as the case may be, in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## V.  THE COURT SHOULD AUTHORIZE THE DEBTOR TO ENTER INTO AND APPROVE A GOING CONCERN TRANSACTION AND RELATED RELIEF IN CONNECTION THEREWITH

### A.   In the Event the Successful Bidder Submits a Going Concern Transaction, Sale of the Subject Assets and any other assets of the Debtor Should Be Granted Free and Clear of Certain Liens, Claims, Interests and Encumbrances.

76.     Under  section 363(f) of the Bankruptcy Code, a debtor may sell property "under subsection (b) and (c) free and clear of any interest in such property of an entity other than the estate." In particular, section 363(f) authorizes a debtor to sell property free and clear if (i) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (ii)such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also In re Collins*, 180 B.R. 447, 449- 0 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale."); *In re P.K.R. Convalescent Ctrs., Inc.*, 189 B.R. 90, 93-94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens . . . Section 363(f) addresses sales free and clear of any interest . . .").

77.     Other than a lien in favor of GemEMCapAP, the Debtor's DIP and pre-petition secured lender, and the State of Colorado Department of Revenue for Sales Taxes, the Debtor is unaware of any (i) liens, encumbrances or interests (collectively "**Interests**") or (ii) "claims" as defined in section 101(5) of the Bankruptcy Code ("**Claims**") that have been asserted against the Subject Assets and any other assets of the Debtor. The Debtor believes that the Debtor's pre- and post-petition lender will consent to the Approval Order, and otherwise could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of any such interest. Furthermore, the proposed Approval Order will provide that all Interests and Claims attach to the net cash proceeds derived from the Asset Transaction in the same validity, force and effect that such Interests or Claims now have against the Subject Assets and any other assets of the Debtor.

### B.   Proposed Assumption and Assignment of the Assumed Contracts is Within the Debtor's Sound Business Judgment and Should Therefore Be Approved.

78.     Section 365 of the Bankruptcy Code provides that a chapter 11 debtor, subject to Bankruptcy Court approval, may assume or reject executory contracts at any time prior to plan confirmation. 11 U.S.C. § 365(a) and (d)(2).

79.     The assignment of executory contracts and unexpired leases is governed by section 365(f) of the Bankruptcy Code, which provides, in pertinent part, that: (2) The trustee may assign and executory contract or unexpired lease of the debtor only if – (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance or future performance by the assignee of such contract or lease is provided whether or not there has been a default in such contract or lease. 11 U.S.C. § 365(f)(2).

80.     The standard governing bankruptcy court approval of a debtor's decision to assume or reject executory contracts or unexpired leases of nonresidential real property is whether the debtor's reasonable business judgment supports assumption or rejection. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303 (5th Cir. 1985); In re Taylor, 913 F.2d 102, 107 (3d Cir. 1990); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

81.     In the event that the Debtor consummates a Going Concern Transaction, the Debtor would proffer evidence at the Sale Hearing that the assumption and/or assignment of assumed contracts would represent an exercise of sound business judgment. Moreover, the Debtor will proffer evidence at the Sale Hearing to satisfy the requirements of section 365(b) and (f) of the Bankruptcy Code with respect to the assumption and assignment of the assumed contracts. Further, any provision restricting the assignment of any assumed contract would constitute an unenforceable anti-assignment under section 365(f) of the Bankruptcy Code. See, e.g., In re Office Products of America, Inc., 140 B.R. 407, 409 (Bankr. W.D. Tex. 1992) (stating that provisions in a lease which operate to restrict or discourage trustee from otherwise assigning such contract or lease are "struck down" under Bankruptcy Code).

82.     Section 365(b)(1) of the Bankruptcy Code, in turn, provides that if there has been a default on an executory contract or unexpired lease, the debtor may not assume such contract or lease unless, at the time of assumption, the debtor (a) cures, or provides adequate assurance that it will promptly cure, such default, (b) compensates, or provides adequate assurance that it will promptly compensate, the non-debtor party to the agreement for any pecuniary loss resulting from such default, and (c) provides adequate assurance of future performance under the agreement. 11 U.S.C. § 365(b)(1).

83.     To the extent any of the bids received by 4:00 p.m. Prevailing Mountain Time on November 10, 2014 include any proposed assumption and assignment of contracts, Debtor shall notify the counter-parties to the contracts by telephone, e-mail and or fax, within 24 hours of the proposed assumption and assignment and the proposed purchaser, the proposed cure and the proposed assurance of future performance.  Debtor shall also inform the contract party that they may appear at the Sale hearing to object to any statement of cure amount or the adequacy of assurance of future performance.

84.     If a dispute arises regarding a cure amount or other requirements to assume and assign an executory contract, the Debtor will request the Court to provisionally determine each cure amount and the satisfaction of such requirements at the Sale Hearing.

## VI. THE COURT SHOULD WAIVE OR REDUCE THE FOURTEEN-DAY STAY PERIOD OF BANKRUPTCY RULES 6004(h) AND 6006(d)

85.     In addition, by this Motion, the Debtor seeks a waiver of any stay of the effectiveness of the order approving the relief requested in this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the Debtor is facing significant liquidity constraints, which will be eased by an immediate commencement of the  Sale and liquidation of the Liquidation Assets in accordance with the Agency Agreement. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply, or in the alternative, if an objection to the Asset Transaction is filed, reduce the minimum amount of time needed by the objecting party to file its appeal to allow the Asset Transaction to close.

## VII.  RESERVATION OF RIGHTS

86.     The Debtor expressly reserves the right to amend, modify, and/or supplement the relief requested in this Motion in all respects, including, but not limited to, the proposed Bidding Procedures attached hereto, prior to or at the applicable hearing (and the Bidding Procedures prior to or during the Auction) and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## VIII.  NOTICE

87.     Notice of this Motion shall be provided to (a) the Office of the United States Trustee for the District of Colorado, (b) the Debtor's twenty largest unsecured creditors, (c) counsel to the Debtor's secured lender, GemCap, (d) all parties known to be asserting a lien in the Subject Assets, (e) each of the Debtor's landlords at the remaining open stores, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the Office of the Attorney General of the State of Colorado, (h) the Colorado Secretary of State, (h) all cities and counties where the stores are located, (i) all potential bidders, and (j) all entities entitled to notice pursuant to Bankruptcy Rule 2002 (the "**Notice**").

88.     The Debtor submits that, in light of the nature of the relief requested, no other or further notice is necessary or required.

89.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests the entry of the Bid Procedures Order, substantially in the form attached hereto as Exhibit A, and the Approval Order, respectively, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: October 24, 2014.

MARKUS WILLIAMS YOUNG &
ZIMMERMANN  LLC

By:  *Donald D. Allen*
Donald D. Allen, #10340
James T. Markus, #25065
1700 Lincoln Street, Suite 4550
Denver, Colorado 80203-4505
Telephone (303) 830-0800
Facsimile (303) 830-0809

Attorneys for Debtor-in-Possession

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October, 2014, I caused a true and correct copy of the foregoing Emergency Motion Of Debtor To Approve Comprehensive Sale Process Relating To Going Out Of Business Sale And Sale To The Highest Bidder And To (A) Approve Agency Agreement, Bid Procedures And Bid Protections; (B) Schedule A Sale Hearing; (C) Approve The Form And Manner Of Notice Related Thereto; (D) Authorize Sale Free And Clear Of All Liens, Claims, Encumbrances And Interests; And (E) Grant Related Relief to be placed in the United States mail, postage prepaid, and by e-mail to all persons listed below:

| Company | Contact Name | Email/Facsimilie |
|---------|--------------|------------------|
| A Garment | Konvan Leung | konvan@a-garment.com |
| Dong-In | Yoonji Kim | yjkim@dong-in.com |
| Hanoman | Benjamin C. K. Sit | benjamin@hanoman.com.hk |
| Hanoman | Cherry Chung | cherry@hanoman.com.hk |
| Jasper | Man Yee | manyee@jasper.com.hk |
| Li & Fung | Joerg Hoberg | JoergHoberg@LiFung.com.hk |
| Marcus Adler | Andrew Zinaman | andrew@marcusadlergloves.com |
| Tabar | Gary Schloss | gschloss@fownesbros.com |
| Tungsang | Andrew Li | andrew@tungsang.com.hk |
| Vision | ES Kim | eskim@visionbag.com |
| Zenith International dba J Adams | Phillip Pearlman, Esq. | ppearlman@spencerfane.com |
| Zenith International dba J Adams | Jamie Cotter, Esq. | jcotter@spencerfane.com |
| Zenith International dba J Adams | Charlene Huang | charlene@jadams.com.tw |
| Zenith International dba J Adams | Kevin Kuo | kevin@jadams.com.tw |
| Craig Realty Group | David Sanner | dsanner@craigrealtygroup.com |
| DDR Aspen Grove | Renee Weiss | rweiss@ddr.com |
| Hollaender | Jack Reifschneider | JackR@hollaender.com |
| Kelly Services | Sioban Moore | sioban.moore@kellyservices.com |
| BV CenterCal, LLC | Peter Houck | phouck@centercal.com |
| Meridian Centercal | Peter Houck | phouck@centercal.com |
| Station Park Centercal | Peter Houck | phouck@centercal.com |
| United States Trustee Program | Alan K. Motes | Alan.Motes@usdoj.gov |
| Colorado State Dept of Revenue | James Holden | James.Holden@state.co.us |
| Cohen Tauber Spievack & Wagner, P.C. | Robert A. Boghosian | rboghosian@ctswlaw.com |
| American Express | Legal Notice | Via Facsimile:  (623) 444-3001 |

**Via U.S. Mail**

| | | |
|---|---|---|
| IRS<br>1999 Broadway<br>Denver, CO 80202 | | |

*s/Jenny F. Tokuoka*
Jenny F. Tokuoka