## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | CASE NO.: 14-23906-EEB |
| | CHAPTER 11 |
| COUPOUNAS, LLC d/b/a GOLITE, LLC | |
| xxx-xx-0555 | |
|     Debtor in Possession | |

## ORDER APPROVING SALE OF ALL OR SUBSTANTIALLY ALL OF DEBTOR'S ASSETS AND GRANTING RELATED RELIEF

Upon consideration of the Emergency Motion Of Debtor To Approve Comprehensive Sale Process Relating To Going Out Of Business Sale And Sale To The Highest Bidder And To (A) Approve Agency Agreement, Bid Procedures And Bid Protections, (B) Schedule A Sale Hearing, (C) Approve The Form And Manner Of Notice Related Thereto, D) Authorize Sale Free And Clear Of All Liens, Claims, Encumbrances And Interests; And (E) Grant Related Relief (the "Motion"); [1] and it appearing that the relief requested is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion having been given and it appearing that no other notice need be given; and the Debtor and Hilco Merchant Resources, LLC (the "Agent") having agreed upon terms and conditions for the Agent to act as the Debtor's exclusive agent to conduct sales (the "Sale") of certain of the Debtor's assets, including, without limitation, the Merchandise and FF&E ("Assets"), which terms and conditions are set forth in that certain Agency

---

[1] All capitalized terms not otherwise defined in this Order have the meaning ascribed to them in the Motion or in the Agency Agreement.

Agreement, by and between the Agent and Debtor,  form of which is attached hereto as Exhibit A (the "Agency Agreement"); and the transaction represented by the Agency Agreement having been determined to be the highest and best offer for the Assets; and a hearing having been held on October 31, 2014, whereupon the Court entered an Order  (A) Approving Bid Procedures and Bid Protections, (B) Agency Agreement Subject to Higher and Better Bids, (C) Scheduling a Sale Hearing, (D) Approving the Form and Manner of Notice Related Thereto and (E) Granting Related Relief  [Docket No. 53] (the "Bidding Procedures Order"); and a sale hearing having been held on November 13, 2014 (the "Sale Hearing") to consider the remaining relief requested in the Motion and approval of the Agency Agreement; and appearances of all interested parties having been noted on the record of the Sale Hearing; and upon all of the proceedings had before the Court (including but not limited to the testimony and other evidence proffered or adduced at the Sale Hearing); and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, its creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:[2]

A.    **Jurisdiction:**  This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Approval of the Debtor's entry into the Agency Agreement, and the transactions contemplated thereby is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (D), (N) and (O).

---

[2]    The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

B.     **Venue:**  Venue of this case in this district is proper pursuant to 28 U.S.C. § 1409(a).

C.     **Statutory Predicates:**  The statutory predicates for the approval of the Agency Agreement and transactions contemplated therein are sections 105, 363, 364 and 554 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") .

D.     **Notice:**  Proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with sections 102(1), 105(a), and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 6004, and in compliance with the Bidding Procedures Order.  No other or further notice is required.

E.     **Opportunity to be Heard:**  A reasonable opportunity to object or be heard regarding the relief requested in the Motion and the transactions pursuant thereto has been afforded to all interested persons and entities, including, without limitation, the following: (a) the Office of the United States Trustee for the District of Colorado, (b) the Debtor's twenty largest unsecured creditors, (c) counsel to GemCap, (c) all parties known to be asserting a lien in the Debtor's assets, (d) each of the Debtor's landlords, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) the Office of the Attorney General of the State of Colorado, (h) the city of Boulder, Colorado, (i) Boulder County, Colorado, (j) City and County of Denver, Colorado, (k) the city of Ft. Collins, Colorado, (l) Weld County, Colorado (m) the city of Lakewood Colorado, (n) Jefferson County, Colorado, (o) Durango, Colorado, (p) La Plata County, Colorado (q) Town of Silverthorne, Colorado, (r) Summit County, Colorado, (s) counsel for the official committee of unsecured creditors (the "Committee"), and (t) all entities entitled to notice pursuant to Bankruptcy Rule 2002 ((a) through (t) collectively, the "Notice Parties").

Objections, if any, to the Motion have been withdrawn or resolved and, to the extent not withdrawn or resolved, are hereby overruled.

F. **Marketing Process:** As demonstrated by: (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has thoroughly marketed the Assets and has conducted the bidding solicitation fairly, with adequate opportunity for parties that either expressed an interest in acquiring or liquidating the Assets, or who the Debtor believed may have an interest in acquiring or liquidating the Assets, to submit competing bids. The Debtor and the Agent have respectively negotiated and undertaken their roles leading to the Sale and entry into the Agency Agreement in a diligent, noncollusive, fair and good faith manner.

G. **Highest and Best Offer:** The Agency Agreement attached hereto as Exhibit A, including the form and total consideration to be realized by the Debtor pursuant to the Agency Agreement, (i) is the highest and best offer received by the Debtor for the Assets, (ii) is fair and reasonable, and (iii) is in the best interests of the Debtor, its estate, its creditors and all other parties in interest. There is no legal or equitable reason to delay entry into the Agency Agreement, and the transactions contemplated therein, including, without limitation, the Sale.

H. **Business Judgment:** The Debtor's decision to (i) enter into the Agency Agreement, and (ii) perform under and make payments required by the Agency Agreement, is a reasonable exercise of the Debtor's sound business judgment consistent with its fiduciary duties and is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest.

I. **Personally Identifiable Information:** The transactions contemplated by the Agency Agreement do not include the sale or lease of personally identifiable information, as

defined in section 101(41A) of the Bankruptcy Code ("Personally Identifiable Information") (or assets containing personally identifiable information).

J.     **Time of the Essence:**  Time is of the essence in effectuating the Agency Agreement and proceeding with the Sale contemplated therein without interruption.  Based on the record of the Sale Hearing, and for the reasons stated on the record at the Sale Hearing, the Sale under the Agency Agreement must be commenced on the first day following entry of this Order to maximize the value that the Agent may realize from the Sale, and the value that the Debtor may realize from entering into the Agency Agreement.  Accordingly, cause exists to lift the stay to the extent necessary, as contemplated by Bankruptcy Rules 4001(a) and 6004(h) and permit the immediate effectiveness of this Order.

K.     **Sale Free and Clear:**  A sale of the Assets other than one free and clear of liens, claims, encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests, including, without limitation, security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or

unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances") and without the protections of this Order would hinder the Debtor's ability to obtain the consideration provided for in the Agency Agreement and, thus, would impact materially and adversely the value that the Debtor's estate would be able to obtain for the sale of such Assets.  But for the protections afforded to the Agent under the Bankruptcy Code and this Order, the Agent would not have offered to pay the consideration contemplated in the Agency Agreement.  In addition, each entity with an Encumbrance upon the Assets, (i) has consented to the Sale or is deemed to have consented to the Sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Encumbrances who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Therefore, approval of the Agency Agreement and the consummation of the Sale free and clear of Encumbrances is appropriate pursuant to section 363(f) of the Bankruptcy Code and is in the best interests of the Debtor's estate, its creditors and other parties in interest.

L.      **Arms-length Sale:**  The consideration to be paid by the Agent under the Agency Agreement was negotiated at arm's-length and constitutes reasonably equivalent value and fair and adequate consideration for the Assets.  The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances.

M.   **Good Faith:**   The Debtor, its management and its board of directors, and the Agent, its members and its officers, directors, employees, agents and representatives, actively participated in the bidding process and acted in good faith.  The Agency Agreement between the Agent and the Debtor was negotiated and entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.   The Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.   The Debtor was free to deal with any other party interested in buying or selling on behalf of the Debtor's estate some or all of the Assets.   Neither the Debtor nor the Agent has engaged in any conduct that would cause or permit the Sale, the Agency Agreement, or any related action or the transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) or 364(e) of the Bankruptcy Code.   The Agent has not violated section 363(n) of the Bankruptcy Code by any action or inaction.   Specifically, the Agent has not acted in a collusive manner with any person and was not controlled by any agreement among bidders.   The Agent's prospective performance and payment of amounts owing under the Agency Agreement are in good faith and for valid business purposes and uses.

N.   **Insider Status:**   The Agent is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.   No common identity of directors or controlling stockholders exists between the Agent and the Debtor.

O.   **Security Interests:**   The liens provided for in the Agency Agreement and this Order to secure the obligations of the Debtor under the Agency Agreement to the Agent are necessary to induce the Agent to agree to terms for the Agency Agreement that maximize value for the Debtor's estate.   The absence of such protections would impact materially and adversely

7

the value available to the Debtor in the liquidation of its assets in partnership with a liquidation agent. But for the protections afforded to the Agent under the Bankruptcy Code, this Order, and the Agency Agreement, the Agent would not have agreed to pay the Debtor the compensation provided for under the Agency Agreement. In addition, GemCap Lending I, LLC ("Lender") which holds a security interest in the property to which the Agent's security interests attach, has consented to the security interests provided for in the Agency Agreement, subject to the satisfaction of the conditions set forth in the Agency Agreement and in Paragraph 30 of this Order.

P.   **Corporate Authority:** The Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the Agency Agreement and all other transactions contemplated thereby (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement), and entry into the Agency Agreement has been duly and validly authorized by all necessary corporate or similar action, (ii) have all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) have taken all actions necessary to authorize and approve the Agency Agreement and the transactions contemplated thereby. No consents or approvals, other than those expressly provided for herein or in the Agency Agreement, are required for the Debtor to consummate such transactions.

Q.   **No Successor Liability:** No sale, transfer or other disposition of the Assets pursuant to the Agency Agreement or entry into the Agency Agreement will subject the Agent to any liability for claims, obligations or Encumbrances asserted against the Debtor or the Debtor's interests in such Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental,

product line, de facto merger or substantial continuity or similar theories.  The Agent is not a successor to the Debtor or its estate.

R.  **No Sub Rosa Plan:**  Entry into the Agency Agreement and the transactions contemplated thereby neither impermissibly restructure the rights of the Debtor's creditors, nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtor.  Entry into the Agency Agreement does not constitute a sub rosa chapter 11 plan.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

A.  **Motion Granted, Objections Overruled**

1.  The relief requested in the Motion is granted as set forth herein.

2.  Any remaining objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are overruled in all respects and denied.

B.  **Agency Agreement Approved and Authorized**

3.  The Agency Agreement is approved pursuant to section 363 of the Bankruptcy Code.  The Debtor is hereby authorized and empowered to enter into and perform under the Agency Agreement, and the Agency Agreement (and each of the transactions contemplated therein (including without limitation, reaching an agreement and resolution regarding the final reconciliation contemplated by the Agency Agreement, which agreement and resolution shall be binding on all parties (including (without limitation) the Debtor, the Committee, the Lender, any successor chapter 7 or chapter 11 trustee, and all other parties in interest) without further order of the Court)) is hereby approved in its entirety and is incorporated herein by reference.  The failure to include specifically any particular provision of the Agency Agreement in this Order shall not

9

diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agency Agreement and all of its provisions, payments and transactions, be authorized and approved in their entirety.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

4.      All amounts payable to the Agent under the Agency Agreement shall be payable to the Agent without the need for any application of the Agent therefor or any further order of the Court.

5.      Subject to the provisions of this Order, the Debtor and the Agent are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sale in accordance with the Agency Agreement and the sale guidelines (the "GOB Sale Guidelines") attached to the Agency Agreement as Exhibit 8.1, which GOB Sale Guidelines are hereby approved in their entirety.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor, the Agent and each of their respective officers, employees and agents are hereby authorized and directed to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein. Demetri Coupounas, the Debtor's President, is specifically authorized to act on behalf of the Debtor in connection with the Sale and no other consents or approvals are necessary or required for the Debtor to carry out the Sale, effectuate the Agency Agreement and each of the transactions and related actions contemplated or set forth therein.

**C.      Order Binding**

7.      Intentionally Omitted

8.     This Order and the terms and provisions of the Agency Agreement shall be binding on all of the Debtor's creditors (whether known or unknown), the Debtor, the Agent, and their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Assets, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity or other fiduciary, such terms and provisions likewise shall be binding.  The provisions of this Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan(s) of the Debtor or converting the Debtor's case from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Order and the Agency Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtor, the Agent and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code.  Any trustee appointed in this case shall be and hereby is authorized to operate the business of the Debtor to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and Agent and the trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of the trustee without the need for further order of this Court.

**D.     Good Faith.**

9.     Entry into the Agency Agreement is undertaken by the parties thereto in good faith, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and Agent shall be protected by sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Order

is reversed or modified on appeal. The reversal or modification on appeal of the authorization provided herein to enter into the Agency Agreement and consummate the transactions contemplated thereby shall not affect the validity of such transactions, unless such authorization is duly stayed pending such appeal. The Agent is entitled to all of the benefits and protections afforded by sections 363(m) and 364(e) of the Bankruptcy Code. The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

### E.   Conduct of the Sale

10.   Except as otherwise provided in the Agency Agreement, pursuant to section 363(f) of the Bankruptcy Code, the Agent shall be authorized to sell all Merchandise, the FF&E and other Assets to be sold pursuant to the Agency Agreement free and clear of any and all Encumbrances, including, without limitation, the liens and security interests, as the same may have been amended from time to time, of the Lender, the State of Colorado and the City and County of Boulder, Colorado whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which this chapter 11 case was commenced, with any presently existing liens encumbering all or any portion of the Assets or the Proceeds thereof attaching only to the Guaranteed Amount and, subject to the Agent's liens granted pursuant to the Agency Agreement and this Order, other amounts payable to the Debtor under the Agency Agreement, with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist. For the sake of clarity, however, nothing in this paragraph is intended to diminish the liens in favor of the Agent, as reflected in the Agency Agreement and this Order, that attach to, among other things, the Proceeds of the Sale.

11.     If any person or entity that has filed financing statements, mortgages, construction or mechanic's liens, lis pendens or other documents or agreement evidencing liens on or interests in the Assets shall not have delivered to the Debtor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of any Encumbrances which the person or entity has with respect to the Assets, each such person or entity is hereby directed to deliver all such statements, instruments and releases and the Debtor and the Agent are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity asserting the same and the Agent is authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such interest.

12.     All entities that are presently in possession of some or all of the Assets or other property in which the Debtor holds an interest that are or may be subject to the Agency Agreement hereby are directed to surrender possession of such Assets or other property to the Agent.

13.     The Debtor and the Agent shall not extend the Sale Termination Date beyond December 31, 2014 unless extended by mutual written agreement of the Debtor (in consultation with GemCap and the Committee) and the Agent following a commensurate extension of the expiration date of the Agent Letter of Credit.

14.     Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtor and the Agent to consummate the Agency Agreement and to consummate the transactions contemplated therein, including, without limitation, to conduct and advertise the Sale in the manner contemplated by the Agency

13

Agreement, including, without limitation, conducting and advertising of the Sale (at the contractual rates charged to the Debtor prior to the Petition Date) in accordance with the Agency Agreement, the GOB Sale Guidelines, and this Order.

15.      Nothing in this Order or the Agency Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Agency Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.  Nothing herein shall be construed to be a determination that the Agent is an operator with respect to any environmental law or regulation.  Moreover, the Sale shall not be exempt from, and the Agent shall be required to comply with, laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Order shall alter or affect the Debtor's and Agent's obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Order shall be deemed to bar any Governmental Unit (as defined in Bankruptcy Code section 101(27)) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtor's or the Agent's right to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise, pursuant to Paragraph 18

hereunder.  Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Order shall be deemed to have made any rulings on any such issues.

16.    Intentionally Omitted.

17.     The Debtor and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Sale without necessity of further order of this Court as provided in the Agency Agreement or the GOB Sale Guidelines, including, but not limited to, advertising the Sale as "going out of business," "total liquidation," "store-closing" or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), use of signwalkers and street signage.

18.    Except as expressly provided in the Agency Agreement, the Sale shall be conducted by the Debtor and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets or "going dark" provisions.  The Agent and landlords of the stores where sales are being conducted are authorized to enter into agreements ("Side Letters") between themselves modifying the GOB Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Agent and any such landlords, provided that nothing in such Side Letters affects the provisions of Paragraph 17. In the event of any conflict between the GOB Sale Guidelines and any Side Letter, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the GOB Sale Guidelines, and except with respect to any Governmental Unit (as to which Paragraph 17 shall apply), no person or entity, including but not limited to any landlord, licensor, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such Sale, and all such parties and persons of every nature and description, including landlords, licensors, creditors and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, or otherwise impeding, the conduct of the Sale and/or (ii) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtor, the Agent, or the landlords at the Debtor's closing stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease or license based upon any relief authorized herein.

20.     The Agent shall have the right to use the Debtor's closing stores and all related store services, furniture, fixtures, equipment and other assets of the Debtor for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the GOB Sale Guidelines and this Order and subject to Paragraph 17 of this Order.

21.     Nothing in this Order shall (a) alter or affect the Debtor's obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or other counterparty to a lease with the Debtor to file an appropriate motion or otherwise seek appropriate relief if the Debtor fails to comply with section 365(d)(3) of the Bankruptcy Code;

provided that the conduct of the Sale in accordance with the Sale Guidelines shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

22.     Pursuant to section 554(a) of the Bankruptcy Code, the Debtor and the Agent, as applicable, are permitted to abandon property of the Debtor's estate in accordance with the terms and provisions of the Agency Agreement, without incurring liability to any person or entity; provided, however, that, unless the Agent otherwise consents, the Debtor may only abandon property located in any store (and, if applicable, the distribution center) on or after the applicable Sale Termination Date.  In the event of any such abandonment, all applicable landlords shall be authorized to dispose of such property without any liability to any individual or entity that may claim an interest in such abandoned property, and such abandonment shall be without prejudice to any landlord's right to assert any claim based on such abandonment and without prejudice to the Debtor or other party in interest to object thereto.

23.     Before any sale, abandonment or other disposition of the Debtor's computers (including software) and/or cash registers and any other point of sale FF&E located at the Stores (collectively, "POS Equipment") that may contain customer lists, identifiable personal and/or confidential information about the Debtor's employees and/or customers, or credit card numbers ("Confidential Information") takes effect, the Debtor shall remove or cause to be removed the Confidential Information from the POS Equipment.

24.     The Agent shall accept the Debtor's validly-issued gift certificates and gift cards that were issued by the Debtor prior to the Sale Commencement Date, and the Debtor shall reimburse Agent for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in Section 8.6 of the Agency Agreement.  The Agent shall accept returns of merchandise sold by the Debtor prior to the Sale Commencement Date, provided that

such return is otherwise in compliance with the Debtor's return policies in effect as of the date such item was purchased and the customer is not repurchasing the same item so as to take advantage of the sale price being offered by the Agent, and the Debtor shall reimburse Agent for such amounts during the weekly sale reconciliation provided for and subject to the limitations set forth in Section 8.7 of the Agency Agreement.

25.     All state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales." The Debtor and/or the Agent shall accept return of any goods purchased during the Sale that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within seven (7) days of their purchase, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect. The Debtor shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any goods purchased during the Sale that contain such a latent defect.

26.     During the Sale Term, the Agent shall be granted a limited license and right to use the trade names, logos and customer, mailing and e-mail lists, websites and social media relating to and used in connection with the operation of the Stores as identified in the Agency Agreement, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement; provided, however, that the Agent shall not receive Personally Identifiable Information from the Debtor.

27.     Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement, and none of the Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of the Debtor's obligations relating to any

of the Debtor's employees.  Moreover, the Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

28.     The Agent shall not be liable for sales taxes except as expressly provided in the Agency Agreement and the payment of any and all sales taxes is the responsibility of the Debtor. The Debtor is directed to remit all taxes arising from the Sale to the applicable Taxing Authorities as and when due, provided that in the case of a bona fide dispute the Debtor are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the Taxing Authority.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtor shall not be used to pay any creditor or any other party, other than the Taxing Authority for which the sales taxes are collected.  The Agent shall collect, remit to the Debtor and account for sales taxes as and to the extent provided in the Agency Agreement. This Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under State law.

29.     Subject to the terms set forth in the Agency Agreement, the Debtor and/or the Agent (as the case may be) are authorized and empowered to transfer Assets among the closing stores and the distribution center.  The Agent is authorized to sell the Debtor's furniture, fixtures and equipment and abandon the same, in each case, as provided for and in accordance with the terms of the Agency Agreement.

### F.     Liens Granted To Agent

30.     Pursuant to 11 U.S.C. § 364(d), effective upon payment by Agent of the Initial Guaranty Payment and issuance of the Letter of Credit, Debtor is authorized to grant to Agent

first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 of the Agency Agreement; (iv) the commission regarding the sale or other disposition of Owned FF&E under Section 7 of the Agency Agreement; (v) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) of the Agency Agreement, and (vi) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of this Order, payment of the Initial Guaranty Payment, and issuance of the Letter of Credit, the security interests and liens granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

### G.     Other Provisions

31.     The Agent shall not be liable for any claims against the Debtor, and the Debtor shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement.  The Agent shall have no successor liability whatsoever with respect to any Encumbrances or claims of any nature that may exist against the Debtor, including, without limitation, the Agent shall not be, or to be deemed to be: (i) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk-transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories; or (ii) a joint employer, co-employer or

successor employer with the Debtor, and the Agent shall have no obligation to pay the Debtor's wages, bonuses, severance pay, vacation pay, WARN act claims (if any), benefits or any other payments to employees of the Debtor, including pursuant to any collective bargaining agreement, employee pension plan, or otherwise, except as expressly set forth in the Agency Agreement.

32.     The Agent is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Order, the various procedures contemplated herein, any issues related to or otherwise connected to the Sale, and the Agency Agreement.

33.     Nothing contained in any plan confirmed in the Debtor's chapter 11 case or any order of this Court confirming such plan or in any other order in this chapter 11 case (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or the terms of this Order.

34.     The Agency Agreement and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court, provided that the Committee and Lender consent, which consent shall not be unreasonably withheld or delayed.

35.     Except with respect to any Governmental Unit (as to which the provisions of Paragraph 17 shall apply), this Court shall retain exclusive jurisdiction with regard to all issues or disputes relating to this Order or the Agency Agreement, including, but not limited to, (i) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and signwalker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtor, the landlords and/or the Agent for protection from interference with the

Sale, (iii) any other disputes related to the Sale, and (iv) to protect the Debtor and/or the Agent against any assertions of Encumbrances. No such parties or person shall take any action against the Debtor, the Agent, the landlords or the Sale until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

36. Notwithstanding Bankruptcy Rules 4001 and 6004, or any other law that would serve to stay or limit the immediate effect of this Order, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Agent are free to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement.

37. To the extent that anything contained in this Order explicitly conflicts with a provision in the Agency Agreement or the GOB Sale Guidelines, this Order shall govern and control.

38. Notwithstanding anything to the contrary in the Agency Agreement or this Order, prior to the sale of any Remaining Merchandise by Agent, Agent shall provide VF International Sagl, successor by merger with Timberland Switzerland GmbH ("Timberland"), with notice of such proposed sale by email to Kristine_Marvin@vfc.com. Timberland shall have five (5) business days to object to the sale thereof (an "Objection") by email to ifredericks@hilcoglobal.com. If no Objection is received by Agent, Agent shall be authorized to consummate such sale without further order of the court or approval of Timberland or any other party. If an Objection is received by Agent, Agent shall not be authorized to consummate the sale absent written (including email) agreement from Timberland or further order of the Court.

All rights and claims of the Debtor (acting though the Agent) and Timberland with respect to sale of the Remaining Merchandise, including under Section 29 of that certain License Agreement by and between GoLite, LLC and Timberland dated May 31, 2006, are hereby preserved

Dated: <u>November 13,  </u>, 2014

THE HONORABLE ELIZABETH E. BROWN
UNITED STATES BANKRUPTCY JUDGE

EXHIBIT "A"

**EXECUTION VERSION**

**AGENCY AGREEMENT**

This Agency Agreement ("Agreement") is made as of October 24, 2014, by and between Coupounas, LLC d/b/a GoLite, LLC ("Merchant") and Hilco Merchant Resources, LLC ("Agent").

Section 1. Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's (i) six (6) retail store locations identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores") and (ii) if Agent elects to use Merchant's e-commerce platform, e-commerce platform by means of a "store closing", "sale on everything", "going out of business", "everything must go", or similar sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E in the Stores and Merchant's one (1) warehouse/distribution center identified on Exhibit 1 attached hereto (the "Distribution Center");

WHEREAS, on October 13, 2014, Merchant filed a chapter 11 case in the United States Bankruptcy Court for the District of Colorado (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2. Appointment of Agent/Approval Order.

(a)    Subject to entry of an order authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.

(b)    The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that (i) this Agreement is in the best interest of the Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Initial Guaranty Payments (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amounts and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores, Merchant's e-commerce platform, and all related Store and e-commerce services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval

Order; (vii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, e-mail lists, customer lists, e-commerce sites (including (without limitation) websites and social media sites such as Facebook, and Twitter) relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors, e-commerce service provides, and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") senior to all other superpriority claims, including (without limitation) to the superpriority claims of the Lender; (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores and through the e-commerce platform uninterrupted; (xv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amounts under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

        (c)    Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "going out of business", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

111431309 v2

Section 3.  Consideration to Merchant and Agent.

    3.1    Payments to Merchant.

        (a)    Subject to Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive sixty-five percent (65.0%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3.  The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, (B) the aggregate Cost Value of the Merchandise subject to Gross Rings; and (C) any other adjustments to Cost Value as expressly contemplated by this Agreement.

        (b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than $1,200,000 and not more than $1,350,000 (the "Merchandise Threshold") as of the Sale Commencement Date.  To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

        (c)    The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being 52.9% (the "Cost Factor Threshold").  To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage greater than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

        (d)    The adjustments to the Guaranty Percentage contemplated by Sections 3.1(b) and 3.1(c) shall be independent and cumulative.

    3.2    Compensation to Agent, Sharing:

        (a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to six percent (6.0%) of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and THEREAFTER: twenty percent (20%) to Agent and eighty percent (80%) to Merchant ("Sharing Amounts").

        (b)    To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means of bulk sale/wholesale or otherwise.  Through March 30, 2015, Agent and its affiliates shall be authorized to (i) sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and (ii) advertise the sale of the Remaining Merchandise using Merchant's name and logo.  The proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3

3.3     Proceeds; Time of Payments; Control of Proceeds.

(a)     For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; (c) all proceeds generated or derived from shipping or other income related the internet, web, or e-commerce businesses during the Sale Term, exclusive of applicable Sales Taxes, and (d) any and all proceeds received by Agent from the disposition of Remaining Merchandise.  For the avoidance of doubt, proceeds from the sale of Owned FF&E shall not be "Proceeds".

(b)     On the second business day following the entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to eighty percent (80%) of the estimated Guaranteed Amount of the Cost Value of Merchandise in the Stores as of the Sale Commencement Date (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date) (the "Initial Guaranty Payment") by wire transfer to an account designated in writing by GemCap Lending I, LLC (the "Lender") ("Lender's Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to [the Lender's Account] on the earlier of (i) 30 days after the Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Merchant (the "Final Inventory Report"); provided, that, in the case of (i) above, Agent shall tender payment of the undisputed portion only on account of any remaining portion of the Guaranteed Amount. In the event of a dispute as to the calculation of the portion of the Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth in Section 8.7 hereof, and Agent's failure to pay such balance or undisputed portion shall entitle the Merchant and the Lender (individually or collectively) to draw upon the Letter of Credit in accordance with Section 3.4 hereof to the extent of such balance or undisputed portion.  Merchant and Agent shall exercise reasonable best efforts to reconcile the Inventory Taking within twenty (20) days after its completion.  In the event that the Initial Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount by which the actual Guaranteed Amount exceeds or is less than the sum of the Initial Guaranty Payment. If, for any reason, Merchant fails to pay Agent in accordance with the preceding sentence, provided Lender received the Initial Guaranty Payment, Lender shall pay the amount not paid by Merchant within two (2) business days after receipt of notice by Lender of Merchant's failure to so pay.  To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7.

(c)     All Proceeds shall be controlled by Agent in the manner provided for below.

(i)     Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts

4

contemplated by this Agreement and the distribution of amounts payable hereunder. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(iii)     Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds) in such accounts from and after the Sale Commencement Date. If requested by Agent, each account shall be subject to an agreement between and among the Agent, the Merchant and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of the Merchant (a "Control Agreement"). If, notwithstanding the provisions of this Section 3.3(c), Merchant or Lender receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant and Lender shall be deemed to hold such Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's or Lender's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)     On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds, Proceeds from credit card sales, and all other amounts) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant. Agent shall notify Merchant of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall.

5

(d)     In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under Section 3.3(e) by means of an offset, and, as a result of such funding or payment, Merchant received more value than Merchant would have otherwise received under this Agreement had Agent not funded or paid such obligations, Merchant shall pay all such funded or paid amounts to Agent within two (2) business days of Agent's request.  If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, Lender shall, within two (2) business days of written demand by Agent, pay to the Agent the over-funded amount.

(e)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)     In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

3.4     Security.  In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish to Lender, as Merchant's designee, an irrevocable standby Letter of Credit naming Lender and Merchant as co-beneficiaries (each, a "Beneficiary") in the aggregate original face amount equal to the sum of: (a) twenty percent (20%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "Letter of Credit").  The Letter of Credit shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and Lender; Merchant and Lender hereby agree that Bank of America and its affiliates are acceptable.  The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date.  Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all steps necessary to remove itself as a named co-beneficiary thereunder.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiaries shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If the Beneficiaries fail to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then the Beneficiaries shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, either Merchant and/or Lender, as Merchant's designee may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute.  Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount to the time of each such request (and Merchant and Lender shall cooperate with respect to each such request); provided, however, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of estimated Expenses.

6

Section 4.  Expenses of the Sale.

4.1    Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the (i) Store-level operating expenses of the Sale and (ii) solely to the extent set forth in sections 4.1(r) and 4.1(s), Central Service Expenses and Distribution Center Expenses, which, in the case of (i) and (ii) arise during the Sale Term and are attributable to the Sale, limited in all respects to the following:

(a)    actual payroll with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term (excluding hours worked during the Inventory Taking) as well as payroll for any temporary labor engaged for the Sale;

(b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 15.0% of the base payroll for each Retained Employee in the Stores (the "Payroll Benefits Cap");

(c)    the actual Occupancy Expenses categorized on Exhibit 4.1(c) in all cases limited on a per Store, per category, and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c), plus the percentage rent, if any, for the Silverstone Store and the Lakewood Store;

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)    costs for additional Supplies at the Stores and the Distribution Center necessary to conduct the Sale as requested by Agent;

(i)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Center, including (but not limited to) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and Distribution Center, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

7

(m)     fifty percent (50%) of cost of the Inventory Taking Service;

(n)     Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(o)     Agent's out-of-pocket costs and expenses associated with this Agreement, the Sale, or the transactions contemplated by this Agreement, including, but not limited to, legal fees and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the Sale;

(p)     third party payroll processing expenses associated with the Sale;

(q)     costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of section 8.1(e);

(r)     actual Central Service Expenses in an amount up to $2,500 per week (pro-rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services;

(s)     if Agent, in Agent's discretion, elects to use Merchant's e-commerce business platform for purposes that include selling Merchandise, actual Distribution Center Expenses in an amount up to $6,400 per week (pro-rated for partial weeks) from the Sale Commencement Date through the Vacate Date for the Distribution Center (payable to Merchant) in respect of the cost of Merchant providing Distribution Center Services;

(t)     actual costs of shipping Merchandise sold to customers using Merchant's e-commerce business platform;

(u)     actual costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale; and

(v)     the actual costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale in an amount not to exceed $30,000.

Notwithstanding anything herein to the contrary other than Section 4.1(u), to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control (unless such Expense is part of Section 4.1(u), in which case Section 4.1(u) shall control), and such Expenses shall not be double counted.  There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)     "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology, accounting, and services necessary for internet, web, and e-commerce business infrastructure, support, marketing, "site" updates, and maintenance (collectively, "Central Services").

111431309 v2

(ii)    "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)    "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities (including gas and electric), CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, T-1 lines, broadband internet, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(iv)    "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses (except as provide in Section 4.1(r)), (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred, excluding from this Section 4.1(v)(iii), percentage rent, if any, for the Silverstone Store and the Lakewood Store; (iv) any expenses of any kind relating to or arising from Merchant's home office or Distribution Center, including (without limitation) the Distribution Center Expenses (except if Agent, in Agent's discretion elects to use Merchant's e-commerce business platform for purposes that include selling Merchandise and then solely to the extent provided in Section 4.1(s) and (t)), and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2    Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e. Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent and/or Merchant may review or audit the Expenses at any time.

4.3    Distribution Center Expenses

No later than the Sale Commencement Date, Agent shall exercise Agent's right to elect to utilize Merchant's e-commerce business platform for purposes that include the sale of Merchandise and advise Merchant with respect to such election. Agent shall be responsible for allocating and designating the shipment of, and Merchant shall ship in accordance with such allocations and designations, Merchandise, from the Merchant's Distribution Center (i) to the Stores and (ii) if Agent, in Agent's discretion, elects to use Merchant's e-commerce business platform for purposes that include selling

9

Merchandise, to e-commerce customers who purchase Merchandise through Merchant's e-commerce business platform. From time to time, Merchant and Agent shall cooperate with each other and shall mutually agree upon a schedule and allocation to the Stores of the Merchandise located at the Distribution Center and On-Order Merchandise. Notwithstanding the foregoing and except if Agent, in Agent's discretion elects to use Merchant's e-commerce business platform for purposes that include selling Merchandise and then solely to the extent provided in Section 4.1(s) and (t), all costs and expenses of operating the Distribution Center, including, but not limited to, Occupancy Expenses, Distribution Center employee payroll, benefits, and other obligations, and/or processing, transferring, consolidating, shipping, and/or delivering goods within or from the Distribution Center (collectively, the "Distribution Center Services" and the costs and expenses associated with such services, the "Distribution Center Expenses"), shall remain the sole obligation of the Merchant and shall not be an Expense of the Sale.

    Section 5. Gross Rings; Merchandise.

       5.1   Inventory Taking.

          (a)   Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level Cost Value and Retail Price physical inventory of the Merchandise located in the Stores and the Distribution Center (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than fourteen (14) days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service). On-Order Merchandise that is in-transit to a Store as of the Inventory Date for such Store shall be counted by Merchant and Agent upon receipt at each such Store. Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Merchant, Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store. Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store. Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs, Cost Value, and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and Retail Price of the Merchandise). Each Store will be closed during the Inventory Taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business. The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reviewed, reconciled, and mutually verified by the Merchant and Agent in writing as soon as practicable following the Inventory Taking.

          (b)   At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash

reports of sales within such Store. Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale. Agent shall pay that portion of the Guaranteed Amount attributable to sales at the Stores (but not through the e-commerce business platform) calculated on the Gross Rings basis, to account for shrinkage, on the basis of 101.0% of the aggregate Cost Value of Merchandise sold during the Gross Rings period. All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice. Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

(c)     With respect to Distribution Center Merchandise, Merchant and Agent agree to count such Distribution Center Merchandise according to either of the following:

(i)     If Merchant and Agent mutually agree in each party's sole discretion, Merchant and Agent shall count the Distribution Center Merchandise prior to the Sale Commencement Date according to practices and procedures mutually acceptable to Merchant and Agent and determine, in accordance with section 5.3 of this Agreement, the Cost Value and Retail Price of each such item of Distribution Center Merchandise. Upon completion of the foregoing, Merchant and Agent shall jointly certify in writing the results of such count in which case such certified inventory count, less shipments or sales that occur during the period beginning after the date such count is completed and prior to the Sale Term, shall constitute the inventory taking with respect to Distribution Center Merchandise for all purposes of this Agreement; or

(ii)     If the Distribution Center Merchandise is not counted as provided for in section 5.1(c)(i), Distribution Center Merchandise shall be counted as follows: (1) beginning as of the Sale Commencement Date and continuing until completed, Merchant and Agent shall jointly count a mutually acceptable percentage and mix of Distribution Center Merchandise according to practices and procedures mutually acceptable to Merchant and Agent for purposes of determining, among other things, the quantity of goods and the Cost Value and Retail Price, as determined in accordance with section 5.3 of this Agreement, and thereafter compare the results of such count to the Merchandise File; and (2)(x) if the Merchant and Agent mutually agree upon the variance, if any, such variance shall be extrapolated across all of the Distribution Center Merchandise and the results thereof shall constitute the inventory taking with respect to Distribution Center Merchandise for all purposes of this Agreement; or (y) if the Merchant and Agent are unable to mutually agree upon the variance, Merchant and Agent shall continue to select a mutually acceptable percentage and mix of Distribution Center Merchandise and count such Merchandise in accordance with section 5.1(c)(ii)(1) until Merchant and Agent mutually agree in accordance with section 5.1(c)(ii)(2)(x). Upon completion of the foregoing, Merchant and Agent shall jointly certify in writing the results of such count in which case such certified inventory count shall constitute the inventory taking with respect to Distribution Center Merchandise for all purposes of this Agreement

(iii)     Merchant and Agent shall use commercially reasonable efforts to complete counting the Distribution Center Merchandise, whether pursuant to section 5.1(c)(i) or (ii) as soon as practicable and so as to attempt to minimize disruption to shipments from the Distribution Center. On Order Merchandise received at the Distribution Center prior to completion of the inventory count provided for in section 5.1(c) shall be included in process of counting the Distribution Center Merchandise. On Order Merchandise received at the Distribution Center after completion of the inventory count shall be counted based on the shipping manifest received by the Merchant at the time such On Order Merchandise was received at the Distribution Center.

5.2     Merchandise Subject to This Agreement.

(a)     For purposes of this Agreement, "Merchandise" shall mean all (i) new, finished, first-quality saleable goods in the ordinary course of business located at the Stores or the Distribution Center as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) Defective Merchandise, and (iii) On-Order Merchandise received for the first time at the Stores or the Distribution Center no later than seven (7) days after the Sale Commencement Date, provided that if such goods are received for the first time at the Stores or the Distribution Center after such 7-day period, but on or before fourteen (14) days after the Sale Commencement Date (the "Receipt Deadline"), such goods shall be included in the Sale as Merchandise at the Cost Value and Retail Price of each good multiplied by the inverse of the then prevailing Sale discount for each such good. "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant's Consignment Goods; (5) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, and other personal property (collectively, "FF&E") or improvements to real property; provided that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; or (6) On Order Merchandise, or goods in-transit received at the Stores or the Distribution Center after the Receipt Deadline.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal or ordinary course. Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items. Notwithstanding anything herein to the contrary, sample goods and goods on display in the Stores shall not be deemed to be Defective Merchandise unless otherwise defective as described in the previous sentence.

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value and (ii) obsolete or discontinued goods. Excluded Defective Merchandise shall be identified as such during the Inventory Taking. For the avoidance of doubt, goods branded as "GoLite" shall not per se be considered "obsolete or discontinued" goods by the mere fact that such goods are branded "GoLite" and Merchant is going out of business.

"On-Order Merchandise" means all new, finished, first-quality saleable goods in the ordinary course of business that are on-order or in-transit and reflected on Exhibit 5.2(b), which inventory may be received in the Stores or the Distribution Center after the Inventory Date.

"Merchandise File" shall mean Merchant's "Inventory_By_SKU_10-15-2014.xlsx" file.

5.3     Valuation.

(a)     For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (i) the lower of (x) the actual cost of such item and (y) the lowest cost of such item as reflected in the Merchandise File and (ii) the Retail Price.

12

(b)     For purposes of this Agreement, "Retail Price" shall be determined as of the Sale Commencement Date and shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, Merchandise File, PLU, hard-marked, hang tag, or other file price as reflected in Merchant's books and records for such item, excluding in all instances any and all Excluded Price Adjustments. For purposes of calculating Retail Price, if an item of Merchandise has more than one ticketed, marked, shelf, Merchandise File, PLU, hard-marked, hang tag, or other file price, or if multiple items of the same SKU have different ticketed, marked, shelf, Merchandise File, PLU, hard-marked, hang tag, or other file price and such pricing does not otherwise qualify as an Excluded Price Adjustment, the lowest ticketed, marked, shelf, Merchandise File, PLU, hard-marked, or other file price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, that are located within the same location (as the case may be, the "Lowest Location Price"), unless it is reasonably determined by Merchant or Agent that the applicable Lowest Location Price was mismarked, normal course markdowns had not been reflected or taken, or such item was priced because it was damaged or marked as "as is," in which case the correct price shall control; provided, however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store, the Lowest Location Price shall be determined based upon the lowest Retail Price for such item on a per Store basis. No adjustment to Retail Price shall be made with respect to different Retail Prices for items located in different Stores

(c)     For purposes of this Agreement, "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant: (A) temporary point of sale discounts or similar adjustments); (B) employee discounts; (C) member or customer appreciation points or coupons; (D) multi-unit purchase discounts; (E) adjustments for damaged, defective or "as-is" items; (F) coupons (Merchant's or competitors'), catalog, website, or circular prices, or "buy one get one" type discounts; (G) customer savings pass discounts or "bounce back" coupons, or discounts for future purchases based on dollar value of past purchases; (H) obvious ticketing or marking errors; (I) instant (in-store) or mail in rebates; or (J) similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations.

(d)     Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the Cost Value (and if Agent and Merchant are unable to mutually agree on the Cost Value of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4     Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder. If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods"). The Agent shall retain 20% of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive 80% of the receipts (net of Sales Taxes) in respect of such sales. Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation. If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Closing Stores at Merchant's expense as soon as practicable and shall not be shipped to the Closing Stores from the Distribution Center absent Agent's express written consent. Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1     Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that is one (1) day after the Bankruptcy Court

13

enters the Approval Order, but in no event later than November 14, 2014 (the "Sale Commencement Date"). Agent shall complete the Sale at each Store no later than December 31, 2014 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term"). Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis upon not less than seven (7) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store subject to a Vacate Notice shall continue until the applicable Vacate Date for such Store.

6.2     Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store.

Section 7.  FF&E.

7.1     Owned FF&E.  Agent shall sell all FF&E at the Stores and the Distribution Center owned by Merchant (the "Owned FF&E") pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided, however, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Merchant and Agent following execution of this Agreement.

7.2     Abandonment of FF&E.  Agent shall be authorized to abandon any and all sold and unsold Owned FF&E in place without any cost or liability to any party.

Section 8.  Conduct of the Sale.

8.1     Rights of Agent.  In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "going out of business", "everything must go", or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "Sale Guidelines").  In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a)     to establish Sale prices and discounts;

(b)     except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, e-commerce business platform, and any other assets of the Merchant located at the Stores or the Distribution Center (whether owned, leased, or licensed);

14

(c)      (i) subject to Agent's payment in accordance with Sections 4.1(r) above in respect of Central Services, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, operate Merchant's e-commerce business platform for purposes of, among other things, selling Merchandise, and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant, whether in house or otherwise; provided, however, that, in the event Agent expressly requests Merchant to provide services other than those normally or customarily provided to the Stores by Merchant, whether in house or otherwise, in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and e-commerce, web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)      to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "going out of business", "everything must go", or similar themed including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

(e)      to transfer Merchandise between and among the Stores at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Inventory Taking; and

(f)      if Agent, in Agent's discretion, elects to use Merchant's e-commerce business platform for purposes that include selling Merchandise, sell Merchandise and otherwise promote and advertise the Sale using Merchant's e-commerce business platform.

8.2      Terms of Sales to Customers: Final/As Is Sales.  Unless Agent elects, in Agent's sole discretion, to accept returns of Merchandise sold using Merchant's e-commerce business platform during the Sale Term according to return policies established by Agent (in which case Agent shall be responsible for the costs and expenses associated with such returns of Merchandise sold using Merchant's e-commerce business platform as an Expense), all sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  Agent shall accept and honor coupons during the Sale Term, including but not limited to, Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to, Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3      Sales Taxes.

(a)      During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income)

15

payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account"). Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account. Merchant will be given access to the computation of gross receipts for verification of all such tax collections. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party, and Merchant (and Lender to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies. Agent shall have the right to use, without charge, all existing supplies located at the Stores, Distribution Center and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse the Merchant at Merchant's cost therefor.

8.5     Returns of Merchandise. Agent shall accept returns of goods sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date. If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Cost Value and Retail Price, multiplied by the inverse of the then prevailing Sale discount on the date of the return. The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5). In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7. Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.

(a)     During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, the "Gift Certificates");

111431309 v2

and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)    During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7    Sale Reconciliation.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amounts, and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order).  During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, but not limited to, Cost Value, Retail Price, Merchandise, Expenses, and Proceeds) to review and audit such records.  In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value or Retail Price of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.

8.8    Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9    Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

17

8.10     Additional Agent Goods.  Agent shall not have the right to supplement the Merchandise in the Sale with additional goods procured by Agent.

8.11     Collective Bargaining Agreements; Leases.  Agent shall not be obligated to comply with any of Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in sections 4.1(a) and 4.1(c) herein.

Section 9.  Employee Matters.

9.1     Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

9.2     Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3     Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4     Employee Retention Bonuses.  Subject to approval by the Bankruptcy Court, Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be

inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion. Subject to approval by the Bankruptcy Court, the amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  Conditions Precedent and Subsequent.

(a)  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)  All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)  Lender has executed this Agreement (with all Exhibits attached hereto).

(iii)  The Bankruptcy Court shall have entered the Approval Order by November 13, 2014, or such later date as mutually agreed upon by the Merchant and the Agent (the "Approval Order Deadline").

(b)  The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

(i)  All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)  Lender has executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order.

Section 11.  Representations, Warranties and Covenants.

11.1  Merchant's Representations, Warranties and Covenants.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)  Merchant (i) is a limited liability company duly organized, validly existing and in good standing under the laws of Colorado; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)  Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated

hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender). Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)     Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory. Since September 15, 2014, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Since September 15, 2014, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores. Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or

20

appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale.

(i)    Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)    Since September 15, 2014, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)    Since September 15, 2014, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(l)    Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores and the Distribution Center or on order or in transit.

(m)    Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)    To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)    [Intentionally deleted]

(p)    Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(q)    Merchant has not since September 15, 2014 shipped any Excluded Defective Merchandise from the Distribution Center to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Center to the Stores.

(r)    Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or

111431309 v2

affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)     Merchant shall not, prior to the Sale Termination Date, offer any promotions or discounts at Merchant's retail locations (other than the Stores), except as detailed on Exhibit 11.1(s).

11.2     Agent's Representations, Warranties and Covenants. Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)     The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)     Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

Section 12.  Insurance.

12.1     Merchant's Liability Insurance. Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it

22

currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies. Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term. In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2    Merchant's Casualty Insurance. Subject to approval by the Bankruptcy Court, Merchant shall provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof. From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee, as applicable (as its interest may appear). In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder. Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance. Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors). Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    Worker's Compensation Insurance. Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.   Indemnification.

13.1    Merchant's Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses,

23

liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant, its officers, directors, employees, agents (other than Agent) or representatives.

      13.2   <u>Agent Indemnification</u>.  Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) as set forth in section 8.3 above; and (v) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

    Section 14.  <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

      (a)   The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

      (b)   Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party; or

      (c)   The filing of a motion by any party to covert the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint a chapter 11 trustee.

      (d)   The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder; provided that for the avoidance of doubt, Agent's provision of a Vacate Notice and vacating a Store as a result shall not constitute an Event of Default.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or

entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by the Bankruptcy Court.

Section 15. <u>Agent's Security Interest</u>. Effective upon payment by Agent of the Initial Guaranty Payment and issuance of the Letter of Credit, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (iv) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (v) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and (vi) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "<u>Agent Collateral</u>"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment, and issuance of the Letter of Credit, the security interests and liens granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(a)     Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and Merchant), the Agent's security interests in and liens upon the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, <u>provided</u>, <u>however</u>, that (i) until the Merchant receives payment in full of the Guaranteed Amount and the Sharing Amounts due to Merchant hereunder, the security interest and lien granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests and lien of Lender in the Agent Collateral but solely to the extent and amount of the unpaid portion of the Guaranteed Amount and the Sharing Amounts and (ii) upon payment in full of the Guaranteed Amount and the Sharing Amounts, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interests and liens of Agent. Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UUC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(b)     Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)     In the event of an occurrence of an Event of Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)     "<u>Code</u>" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Colorado.

Section 16. <u>Bidding and Auction</u>. In consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("<u>Auction</u>"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise) Merchant shall pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) twenty-five thousand dollars ($25,000) ("<u>Breakup Fee</u>"), plus reimbursement of Agent's actual out-of-pocket legal and due diligence costs not to exceed $15,000 (the "<u>Expenses Reimbursement</u>"),

25

provided, further, that, if Agent is not the winning bidder at the Auction, the winning bidder shall also purchase Agent's signage and reimburse Agent for shipping costs associated with such signage. At the Auction: (i) the Breakup Fee and Expenses Reimbursement shall not be eligible to be "credit bid" by Agent; and (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 69.0%, with successive overbids in increments of not less than 0.1%; and (iii) all competing liquidation/going out of business bids shall be on substantially the same terms and conditions as this Agreement.

Section 17. Miscellaneous.

17.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

| | |
|---|---|
| If to the Agent: | HILCO MERCHANT RESOURCES, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attention: Ian S. Fredericks<br>Tel: (847) 418-2075<br>Fax: (847) 897-0859<br>Email: ifredericks@hilcotrading.com |
| If to the Merchant: | GoLite, LLC<br>6325 Gunpark Drive, Suite 102<br>Boulder, CO 80301<br>Attention Demetri Coupounas<br>Tel: (303) 339-2304<br>Email: coup@golite.com |
| If to the Lender: | GemCap Lending I, LLC<br>24955 Pacific Coast Highway, Suite A202<br>Malibu, CA 90265<br>Attention: David Ellis<br>Tel: (310) 593-9074<br>Email: dellis@gemcapsolutions.com |

17.2    Governing Law/Exclusive Jurisdiction. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Colorado, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code. Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

17.3    Amendments. This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

17.4    No Waiver. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

17.5     Currency. All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

17.6     Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

17.7     Execution in Counterparts. This Agreement may be executed in one or more counterparts. Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement. This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

17.8     Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

17.9     Wiring of Funds. All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

17.10    Nature of Remedies. Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under sections 3.1(b), 3.1(c), 3.4 and 11.1(o) shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law. No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

17.11    Entire Agreement. This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By:_____

Print Name and Title:

**COUPOUNAS, LLC**

By:_____

Print Name and Title:

**Agreed and Accepted as to Sections**
**3.3(b) (c)(iii), and (d), 3.4, 8.3, 8.8, 8.10, 15(a), 16, and 17:**
**GEMCAP LENDING I, LLC**

By: _____

Print Name and Title: David Ellis, Co-President

## List of Exhibits

Exhibit 1 – Store and Distribution Center List.
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store/Distribution Center, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 5.2(b) – On-Order Merchandise
Exhibit 8.1 – Sale Guidelines
Exhibit 11.1(s) – Promotional Calendar

28

**GoLite, LLC**
**Exhibit 1**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Location List** | | | | | | | | | |

| Store # | Name | Mall/Outlet Name | | Address | City | State | Zip | Landlord | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|
| **Retail Stores** | | | | | | | | | |
| 3 | Boulder | | - | 1222 Pearl Street | Boulder | CO | 80302 | Private Owner | 3,854 |
| 7 | Denver | LoHi Denver | | 1535 Platte Street | Denver | CO | 80202 | Private Owner | 1,150 |
| 8 | Durango | | - | 750 Main Avenue | Durango | CO | 81301 | Private Owner | 5,094 |
| 10 | Fort Collins | Old Town Fort Collins, Suite 160 | | 200 S. College | Fort Collins | CO | 80524 | Private Owner | 1,646 |
| 11 | Lakewood | Colorado Mills Mall, Unit #459 | | 14500 W. Colfax Avenue | Lakewood | CO | 80401 | Simon Property | 3,627 |
| 15 | Silverthorne | Outlets at Silverthorne Red Village, Space #80 | | 145G Stephens Way | Silverthorne | CO | 80498 | Craig Realty | 3,064 |
| 6 | | | | | | | | *Average Sq. Ft.* | 3,073 |
| | | | | | | | | | |
| **Distribution Center** | | | | | | | | | |
| 100 | Distribution Center | | - | 6325 Gunpark Drive, Suite 102 | Boulder | CO | 80301 | | 15,229 |

Hilco Merchant Resources, LLC

10/22/2014

**GoLite, LLC**
**Exhibit 3.1(b)**

| Merchandise Threshold Schedule | | |
|---|---|---|
| **Cost Value** | **Adjustment Points** | **Adjusted Guaranty** |
| 1,450,000 | 0.36% | 61.72% |
| 1,440,000 | 0.36% | 62.08% |
| 1,430,000 | 0.36% | 62.44% |
| 1,420,000 | 0.34% | 62.80% |
| 1,410,000 | 0.34% | 63.14% |
| 1,400,000 | 0.32% | 63.48% |
| 1,390,000 | 0.32% | 63.80% |
| 1,380,000 | 0.30% | 64.12% |
| 1,370,000 | 0.30% | 64.42% |
| 1,360,000 | 0.28% | 64.72% |
| 1,350,000 | | 65.00% |
| 1,200,000 | | 65.00% |
| 1,190,000 | 0.20% | 64.80% |
| 1,180,000 | 0.20% | 64.60% |
| 1,170,000 | 0.20% | 64.40% |
| 1,160,000 | 0.22% | 64.18% |
| 1,150,000 | 0.22% | 63.96% |
| 1,140,000 | 0.22% | 63.74% |
| 1,130,000 | 0.22% | 63.52% |
| 1,120,000 | 0.25% | 63.27% |
| 1,110,000 | 0.25% | 63.02% |
| 1,100,000 | 0.25% | 62.77% |

Note(s):
1. Adjustments between the increments shall be on a prorata basis.
2. Adjustments below $1,100,000 & above $1,450,000 to be mutually agreed upon.

## GoLite, LLC
## Exhibit 3.1(c)

| Cost Factor | | |
|---|---|---|
| **Cost Factor** | **Adjustment Points** | **Adjusted Guaranty** |
| **52.90%** | | **65.00%** |
| 53.00% | 0.23% | 64.77% |
| 53.10% | 0.23% | 64.54% |
| 53.20% | 0.23% | 64.31% |
| 53.30% | 0.23% | 64.08% |
| 53.40% | 0.23% | 63.85% |
| 53.50% | 0.23% | 63.62% |
| 53.60% | 0.23% | 63.39% |
| 53.70% | 0.23% | 63.16% |
| 53.80% | 0.23% | 62.93% |
| 53.90% | 0.23% | 62.70% |

Notes:
1. Adjustments between the increments shall be on a prorata basis.
2. In the event that the Cost Factor of Merchandise is greater than 53.90%, each 0.10% (or pro rata portion thereof) increment shall decrease the Guaranty by 0.26%.

**EXHIBIT 3.4**

**FORM OF AGENT LETTER OF CREDIT**

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2014

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:        _____
                    _____
                    _____
                    _____

                    _____
                    _____
                    _____
                    _____

                    Credit No.: _____
                    Opener's Reference No.: _____

Gentlemen:

BY ORDER OF:        _____

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of _____ (the "Agent") for a sum or sums not exceeding a total of _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2014, or such earlier date on which the beneficiaries shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by an officer of _____ and an officer of _____ (the "Beneficiaries").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiaries in the form attached as **Exhibit B**.

If a drawing is received by _____ at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiaries, as directed below, in immediately available funds on the next Business Day.  If however, a drawing is received by _____ after 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms with the terms and conditions hereof, payment of the drawing amount shall be made to the Beneficiaries in immediately available funds on the second succeeding Business Day.

As used in this Letter of Credit, "Business Day" shall mean any day other than Saturday, Sunday or a day on which banking institutions in _____ are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause, "Drawn under Letter of Credit No. _____, dated _____, 20[ ] of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the Uniform Customs and Practices for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600.

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,

Authorized official

10/23/2014 5:56 PM

## EXHIBIT A

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:    Drawing for Amounts Due to:

_____

_____

_____


_____

_____

_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officers of _____ and of _____, in their respective capacities as Beneficiaries of the Letter of Credit hereby certifies to you that:

(i)      _____ (the "Agent") has not made a payment when due of or for the Guaranteed Amount or Expenses due by the Agent to _____ (the "Merchant'), pursuant to, and as such terms are defined in that certain Agency Agreement, dated as of _____, 2014, by and between the Merchant on the one hand, and the Agent, on the other.

(ii)     The amount to be drawn is $_____ (the "Amount Owing").

(iii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

(iv)     The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)      In accordance with the terms of the Letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No. _____]

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[ ].

_____

By: _____
Name: _____
Title: _____


_____

By: _____
Name: _____
Title: _____

## EXHIBIT B

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re:    Reduction of Face Amount

_____
_____
_____
_____

_____
_____
_____

Ladies and Gentlemen:

The undersigned refer to your Letter of Credit No. _____ (the "Letter of Credit"). Capitalized terms used but not defined herein, shall have the meaning assigned to them in the Letter of Credit. The undersigned, duly authorized officers of _____ and of _____, in their respective capacities as Beneficiaries of the Letter of Credit hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, the undersigned have executed and delivered this certificate as of this _____ day of _____, 20[ ].

_____

By: _____
Name: _____
Title: _____

_____

By: _____
Name: _____
Title: _____

GoLite, LLC
Exhibit 4.1(c)

| Occupancy per Diem | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| | | Stores | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Store # | Store Name | Rent | Property Tax | Repairs | Repairs & Maint | Security | Supplies | Utilities | Total Occupancy | % Rent | Annual Breakpoint | Notes |
| 3 | Boulder | 465 | 10 | 4 | - | 2 | 3 | 26 | 511 | 0.0% | n/a | |
| 7 | Denver | 109 | - | - | 0 | 2 | - | 7 | 119 | 0.0% | n/a | |
| 8 | Durango | 250 | - | - | 1 | 1 | - | 53 | 305 | 0.0% | n/a | |
| 10 | Fort Collins | 158 | 4 | - | 1 | 2 | - | 10 | 169 | 0.0% | n/a | |
| 11 | Lakewood [1] | 132 | - | - | 2 | 2 | - | 7 | 142 | 8.0% | 650,000  8.0% of sales exceeding $650,000 between 7/1/14 - 6/30/15 |
| 15 | Silverthorne | 302 | - | - | - | 2 | 2 | 14 | 319 | 6.0% | 1,136,744  6.0% of sales exceeding $1,136,744 annually |
| 6 | Total | 1,411 | 13 | 4 | 4 | 11 | 5 | 117 | 1,565 | | | |
| | Per Week | 9,874 | 95 | 30 | 25 | 78 | 34 | 819 | 10,954 | | | |
| | Per Store Week | 1,646 | 16 | 5 | 4 | 13 | 6 | 137 | 1,826 | | | |

Notes:
1. Rent for the Lakewood store shall be calculated using a per diem rate of $132 for days of the Lakewood Sale Term incurred during the month of November. To the extent that the Lakewood Sale Term extends into December, the rent shall be calculated using a per diem rate of $258 for the days of the Lakewood Sale Term incurred during the month of December.

EXHIBIT 5.1(a)

[TO BE PROVIDED]

EXHIBIT 5.2(b)

[TO BE PROVIDED]

## EXHIBIT 8.1

### GOLITE SALE GUIDELINES

A.     The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.     On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.     At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.     . The Merchant and the Agent may advertise the Sale as a "going out of business," "store closing" "sale on everything", "everything must go", or similar themed sale.

F.     Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Approval Order. Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.     Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.     Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

1

H.     The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

I.     The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.     Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s). The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

L.     Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease.  Agent shall have no responsibility therefor.

M.     The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

N.     If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:

If to the Agent:

EXHIBIT 11.1(s)

[TO BE PROVIDED]